**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-3906

———————

In re: FOREVER GREEN ATHLETIC FIELDS, INC.,

Debtor


CHARLES C. DAWSON; KELLI DAWSON,

Appellants


———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. Civ. No. 2-14-cv-00641)

District Judge: Honorable Stewart Dalzell

———————

Argued: July 9, 2015

Before: FUENTES, NYGAARD, and ROTH, *Circuit Judges*

(Opinion Filed: October 16, 2015)

Aris J. Karalis, Esq.  **[ARGUED]**
Robert W. Seitzer, Esq.
Maschmeyer Karalis
1900 Spruce Street
Philadelphia, PA 19103

*Attorneys for Debtor, Forever Green Athletic Fields, Inc.*

Steven K. Eisenberg, Esq.  **[ARGUED]**
Stern & Eisenberg
1581 Main Street
Suite 200
Warrington, PA 18976

*Attorney for Appellants, Charles C. Dawson and Kelli Dawson*

Frederic J. Baker, Esq.
United States Department of Justice
Office of the Trustee
833 Chestnut Street
Suite 500
Philadelphia, PA 19107

*Attorney for Trustee, Frederic J. Baker*

Robert H. Holber, Esq.
41 East Front Street
Media, PA 19063

*Attorney for Trustee, Robert H. Holber*

2

---

OPINION OF THE COURT

---

FUENTES, *Circuit Judge*.

Creditors who file an involuntary bankruptcy petition against a debtor must satisfy several statutory requirements before obtaining relief. *See* 11 U.S.C. § 303. Everyone agrees the creditors who filed the petition in this case met those requirements. The question is whether their petition may nonetheless be dismissed as a bad-faith filing. We hold that bad faith provides an independent basis for dismissing an involuntary petition. For the following reasons, we will affirm.

I.

The parties are familiar foes. Founded by Keith Day, Forever Green Athletic Fields sells artificial turf playing fields. In 2005, Forever Green sued one of its competitors, ProGreen, for $5 million for diversion of corporate assets (the "Bucks County Action"). Charles Dawson, who is an owner of ProGreen and a former Forever Green sales representative, would be liable if damages are awarded in that suit.

That same year, Charles and his wife, Kelli Dawson, sued Forever Green for unpaid commissions and wages (the "Louisiana Action"). On March 2, 2011, after years of litigation, the Louisiana court entered a consent judgment in favor of the Dawsons. With interest and other costs, this judgment now totals more than $300,000. To date, Forever Green has not paid a penny on this judgment.

3

While the Louisiana Action was still running its course, the parties to the Bucks County Action agreed to arbitrate their claims. However, on March 30, 2011, just a few weeks after the consent judgment was entered in the Louisiana Action, ProGreen filed a motion to terminate the arbitration. In support of this motion, ProGreen argued that "it has become clear that [Forever Green] is insolvent" and that Keith Day does not "have the ability or desire to pay the Arbitrator's fees and expenses." Supp. App. 505. In addition, ProGreen said that "Charles and Kelli Dawson have a $300,000+ judgment against [Forever Green] and expect judgments in the same amount against [Day] very soon. As such, any monies paid as advance deposits to the Arbitrator by [Forever Green] are subject to execution and garnishment." *Id.* The next month, the Dawsons transferred their judgment in the Louisiana Action to Pennsylvania and obtained a writ of execution against the arbitrator and his law firm. At that point, with his fees in peril, the arbitrator recognized he was adverse to the Dawsons, so he suspended the arbitration until the fee issue was resolved.

During his deposition, Charles Dawson offered some strategic insight into these actions. With the consent judgment in hand, he intended to "[f]ind any available asset that Forever Green may have and try to use the lien to seize it." *Id.* at 710. He testified, "I'm going to use that judgment to levy any monies I can find anywhere, whether it be the arbitrator or anyone else. So, yeah, if we can get the lien paid, that's my number one objective. If I can get it paid, I'm very happy." *Id.* at 711.

In response to the suspension of the arbitration,

Forever Green filed a complaint in state court trying to reinstate the arbitration (the "Philadelphia Action"). Day testified that Forever Green was forced to file this complaint because "Charles Dawson and his counsel were determined to derail the arbitration and this was our own legitimate response to it." *Id.* at 198. According to Day, Charles Dawson and his counsel had "threatened to put [Forever Green] into bankruptcy" if Forever Green did not agree to terminate the arbitration. *Id.* at 199. After Forever Green commenced the Philadelphia Action, the Dawsons' counsel sent a letter to Forever Green saying that the arbitration was in an "indefinite state of suspension" and "[u]nless and until the [consent judgment] for about $300,000.00 is paid off in full, that indefinite state of suspension will continue." *Id.* at 568.

The judge in the Philadelphia Action issued a scheduling order for the parties to brief the issues identified in Forever Green's complaint. The Dawsons' brief was due on May 3, 2012. They never filed it. Instead, they chose a different tack.

Two weeks before their brief was due, the Dawsons and the law firm Cohen Seglias Pallas Greenhall & Furman, which was owed $206,000 from Forever Green, filed an involuntary Chapter 7 bankruptcy petition against Forever Green. Justifying this decision, Charles Dawson said that his counsel "suggested the best way to get to [Forever Green's] assets would be involuntary bankruptcy." App. 268. It is undisputed that the Dawsons and Cohen Seglias satisfied the statutory criteria for commencing an involuntary bankruptcy case because (1) they are three creditors, (2) they each hold an uncontested claim against Forever Green, and (3) their claims aggregate at least $15,325 more than the value of liens

5

on Forever Green's property. *See* 11 U.S.C. § 303(b). Despite the petitioning creditors' facial compliance with the statute, Forever Green moved to dismiss the petition as a bad-faith filing.

The Bankruptcy Court convened an evidentiary hearing on the motion. In addition to receiving evidence of the parties' course of conduct in the years leading up to the filing, the Bankruptcy Court heard testimony about Forever Green's financials. It was established that Forever Green has essentially shut down its business—in 2012, its operating account had no activity and its balance never exceeded $30. Forever Green's focus has been on winding down its affairs and recovering assets for its approximately 50 creditors. As for the balance sheet, Forever Green has $6 million in assets, the largest by far being its claims against ProGreen for $5 million. On the other side of the ledger, Forever Green has $2.3 million in debts, including a $1.3 million secured line of credit.

Although Forever Green itself has not been paying any of its debts, Day has personally paid off hundreds of thousands of dollars of Forever Green debt. He explained that he has paid debts for which he had "financial personal guarantees." App. 256. Day acknowledged that neither he nor Forever Green has paid anything to the Dawsons, but he said that secured creditors and certain unsecured creditors are ahead of them in the pecking order. Day also is personally funding all of Forever Green's current litigation, including this suit and the suspended arbitration against ProGreen.

After the parties made their pitches as to whether the petition was filed in bad faith, the Bankruptcy Court ruled in

6

Forever Green's favor and granted the motion to dismiss. It explained that, because bankruptcy courts are courts of equity, a petitioning creditor (for involuntary bankruptcies) or debtor (for voluntary bankruptcies) must come to the court for a proper purpose. Involuntary Chapter 7 proceedings, it said, are intended to protect creditors from debtors who are making preferential payments to other creditors or from the dissipation of the debtor's assets. Creditors who file petitions for other reasons—such as to collect on a personal debt, to gain an advantage in pending litigation, or to harass the debtor—act in bad faith. The Bankruptcy Court concluded that, even though the petitioning creditors met the statutory filing requirements, Charles Dawson was a bad-faith creditor because he was motivated by two improper purposes: to frustrate Forever Green's efforts to litigate its claim against ProGreen and to collect on a debt. The District Court affirmed. The Dawsons (without Cohen Seglias) filed this appeal.[1]

## II.

We discuss three issues on appeal. First, whether an involuntary petition may be dismissed as a bad-faith filing. Second, whether the Bankruptcy Court erred in finding bad

---

[1] The District Court had jurisdiction under 28 U.S.C. § 158(a)(1), and we have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. We employ the same standard of review over the Bankruptcy Court's decision as that exercised by the District Court. We review the Bankruptcy Court's findings of fact for clear error and its legal determinations de novo. *In re Zinchiak*, 406 F.3d 214, 221-22 (3d Cir. 2005).

7

faith. And third, whether other good-faith creditors could have cured the petition.

A.

Section 303 of the Bankruptcy Code, which governs involuntary cases under Chapter 7 or 11, contains three requirements for commencing an action against a debtor who has twelve or more creditors: (1) there must be three or more petitioning creditors; (2) each petitioning creditor must hold a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute; and (3) the claims must aggregate at least $15,325 more than the value of liens on the debtor's property. 11 U.S.C. § 303(b)(1). It is undisputed that the Dawsons and Cohen Seglias satisfied these three requirements. The Code further provides that the court "shall order relief against the debtor in an involuntary case . . . only if . . . the debtor is generally not paying such debtor's debts as such debts become due." *Id.* § 303(h)(1). The parties agree Forever Green is not paying its debts.

Section 303 has one reference to bad faith. It says that if the court dismisses an involuntary petition, it may award damages against any creditor "that filed the petition in bad faith." *Id.* § 303(i)(2). As one might expect, because the only mention of bad faith is in § 303(i)(2) and deals with post-dismissal damages, the vast majority of litigation concerning bad faith centers on that provision. In the typical case, the creditors do not satisfy the § 303(b) requirements for filing the petition in the first instance (e.g., fewer than three creditors filed the petition or the creditors' claims were subject to bona fide disputes). Following dismissal, debtors

8

invariably file motions for damages under § 303(i)(2), arguing the petition was filed in bad faith.[2]

Less often litigated is the issue here, namely, whether bad faith may serve as a basis for dismissal even where the criteria for commencing a suit are satisfied and where the debtor is admittedly not paying its debts as they become due. According to the Dawsons, we cannot engage in a bad-faith inquiry in these circumstances. They say a creditor's subjective motivations are irrelevant because § 303(b)(1) contains objective criteria for who may file an involuntary petition, and if they are satisfied, § 303(h)(1) provides that the court "shall order relief" against a debtor who is not paying its debts. Some courts have been receptive to this position.[3]

---

[2] *See, e.g.*, *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 257 (6th Cir. 2006); *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 102-03 (2nd Cir. 2000); *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 433 (Bankr. E.D. Pa. 2010); *In re Skyworks Ventures, Inc.*, 431 B.R. 573, 578-79 (Bankr. D.N.J. 2010); *In re Silverman*, 230 B.R. 46, 49 (Bankr. D.N.J. 1998).

[3] *See, e.g.*, *In re WLB-RSK Venture*, No. BAP CC-03-1526-MOPMA, 2004 WL 3119789, at *6 n.13 (B.A.P. 9th Cir. Nov. 24, 2004) ("Section 303 sets forth the standards for granting or denying an order for relief on an involuntary petition. If the grounds for relief exist under section 303, the good or bad faith of the petitioning creditor appears irrelevant . . . ."); *In re Knoth*, 168 B.R. 311, 315 (D.S.C. 1994) ("[T]he motivation of the petitioning creditors is irrelevant on the question of whether the involuntary petition should be granted.").

9

Section 303, furthermore, discusses bad faith only in the context of assessing damages after a petition has been dismissed. If Congress wanted bad faith to be a separate basis for dismissal, one could argue, the Code would have included language to that effect. And although this Court has repeatedly held that a voluntary petition may be dismissed for bad faith, the provisions of the Code at issue in those cases permitted dismissal for "cause."[4] Section 303, by contrast, does not have any similar statutory hook for allowing bad-faith dismissals. Congress must have intended something by this distinction, the argument goes.

We disagree that the text of § 303 forecloses bad-faith dismissals. The Dawsons make much of the fact that they satisfied § 303(b)(1)'s three requirements for commencing an involuntary petition. But meeting the § 303(b)(1) criteria, like pleading a prima facie case in many actions, is just the first hurdle. It does not bear on other defenses that may support dismissal. In other words, if the three filing requirements are not satisfied, we agree the bankruptcy court must dismiss the case; but if the three requirements are satisfied, that doesn't mean the bankruptcy court can't

---

[4] *See, e.g.*, *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) ("A bankruptcy filing made in bad faith may be dismissed 'for cause' under 11 U.S.C. § 1307(c)."); *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) ("Section 707(a) allows a bankruptcy court to dismiss a petition for cause if the petitioner fails to demonstrate his good faith in filing."); *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999) (holding that a "Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith").

dismiss the case.

The one reference to bad faith in § 303 supports our conclusion. Section 303(i)(2) allows a bankruptcy court to award damages following dismissal against "any petitioner that filed the petition in bad faith." Under the Dawsons' reading, courts may engage in a bad-faith inquiry only after they have dismissed a case for the creditors' failure to comply with the statutory filing requirements. We see no reason why the Code would permit the imposition of damages (including punitive damages) for bad-faith filings but not allow the same conduct—such as using involuntary bankruptcy as a litigation tactic in pending proceedings—to provide a basis for dismissing the petition. The better view is that, by including an express reference to bad faith in § 303, Congress intended for bad faith to serve as a basis for both dismissal and damages.

Section 303(h)(1), moreover, does not provide that a bankruptcy court "shall order relief" against a debtor who is not paying its debts. Rather, the court shall order relief "only if" the debtor is not paying its debts, meaning a debtor not paying its debts is a necessary but not sufficient condition for ordering relief. An "if" or "if and only if" clause would have been more favorable to the Dawsons.

The bigger flaw in the Dawsons' argument is that it overlooks the equitable nature of bankruptcy. Time and again, we have emphasized that "good faith" filing requirements have "strong roots in equity." *In re SGL Carbon*, 200 F.3d at 161; *see also In re Tamecki*, 229 F.3d at 207. "At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful

11

balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004). As courts of equity, bankruptcy courts are equipped with the doctrine of good faith so that they can patrol the border between good- and bad-faith filings. *See In re SGL Carbon*, 200 F.3d at 161; *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (explaining that the "good faith" requirement protects the "integrity of the bankruptcy courts by rendering their powerful equitable weapons . . . available only to those debtors and creditors with 'clean hands'"). We will not depart from this general "good faith" filing requirement in the context of involuntary petitions for bankruptcy. The majority of courts agree.[5]

---

[5] *See, e.g.*, *In re U.S. Optical, Inc.*, No. 92-1496, 1993 WL 93931, at *3 (4th Cir. Apr. 1, 1993) (unpublished) ("Courts are duty bound to conduct an inquiry, if requested, to determine whether an involuntary petition has been filed in good faith. Bad faith filings are to be dismissed." (citations omitted)); *In re Bock Transp., Inc.*, 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005) ("A bad faith filing can also be cause for the dismissal of a[n] [involuntary] petition."); *In re Tichy Elec. Co.*, 332 B.R. 364, 373 (N.D. Iowa 2005) (same); *In re Alexander*, No. 00-10500, 2000 WL 33951465, at *3 (D. Vt. Aug. 29, 2000) ("[I]nvoluntary petitions filed in bad faith should be dismissed."); *In re Manhattan Indus., Inc.*, 224 B.R. 195, 201 (Bankr. M.D. Fla. 1997) ("Section 303(b) of the Bankruptcy Code does not expressly refer to good faith filings. Involuntary filings must be made in good faith and consequences flow if they are not. Dismissal is one possible consequence.").

Policy considerations lend further support to this conclusion. "[T]he filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985). Given these serious consequences, courts should be wary of creditors who may find alluring the "retributive quality" of thrusting a debtor into bankruptcy.[6] Allowing for the dismissal of bad-faith filings will encourage creditors to file petitions for proper reasons such as to protect against the preferential treatment of other creditors or the dissipation of the debtor's assets. *See In re Silverman*, 230 B.R. at 53. Accordingly, we hold that an involuntary petition filed under 11 U.S.C. § 303 may be dismissed for bad faith.

## B.

We review the decision to dismiss the case as a bad-faith filing for abuse of discretion. *In re Myers*, 491 F.3d at 125. The determination of bad faith is "a fact intensive

---

[6] Brad E. Godshall & Peter M. Giluhy, *The Involuntary Bankruptcy Petition: The World's Worst Debt Collection Device?*, 53 Bus. Law. 1315, 1315 (Aug. 1998); *see also* David S. Kennedy et al., *The Involuntary Bankruptcy Process: A Study of the Relevant Statutory and Procedural Provisions and Related Matters*, 31 U. Mem. L. Rev. 1, 58 (Fall 2000) (explaining that creditors should not "invoke the involuntary bankruptcy process . . . based on personal whim or vindictiveness seeking to collect an unpaid debt").

determination better left to the discretion of the bankruptcy court." *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996) (citations omitted). In terms of allocating burdens of proof, creditors are presumed to have acted in good faith. *See In re Bayshore*, 209 F.3d at 105. To dismiss the petition, the debtor must show by a preponderance of the evidence that the creditors acted in bad faith. *In re Petralex Stainless Ltd*., 78 B.R. 7389, 743 (Bankr. E.D. Pa. 1987).

At the outset, we must decide on the standard for evaluating bad faith, which is not defined in the Code. On this issue, courts have applied a dizzying array of standards, mostly with regard to post-dismissal motions for damages under § 303(i)(2). *See In re Bayshore*, 209 F.3d at 105-06 (reviewing different standards); *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501-02 (11th Cir. 1997) (same). Some courts, for instance, apply an "improper use" test, which asks whether a "petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interest in a different forum." *In re K.P. Enter.*, 135 B.R. 174, 179 n.14 (Bankr. D. Me. 1992) (internal quotation marks omitted). Other courts apply an "improper purpose" test, which looks to whether the filing "was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." *In re Bayshore*, 209 F.3d at 105. Still others apply an "objective test," which assesses what a reasonable person would have believed and what a reasonable person would have done in the creditor's position. *In re Wavelength, Inc.*, 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986). And yet other courts have applied a broad "totality of the circumstances"

standard, which effectively combines all the tests and looks to both subjective and objective evidence of bad faith. *In re John Richards*, 439 F.3d at 255 n.2.

We adopt the "totality of the circumstances" standard for determining bad faith under § 303. This standard is most suitable for evaluating the myriad ways in which creditors filing an involuntary petition could act in bad faith. It also is the same standard we apply when reviewing allegations that a debtor filed a voluntary petition in bad faith. *See In re Myers*, 491 F.3d at 125; *In re Lilley*, 91 F.3d at 496. In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

Looking at the totality of the circumstances, we conclude that the Bankruptcy Court did not abuse its discretion in finding that Charles Dawson filed the involuntary petition in bad faith. In the Bankruptcy Court's view, "Dawson's prepetition conduct indicates that his litigation strategy was to use any means necessary to force the payment of the Consent Judgment and the abandonment of

Forever Green's claims against [ProGreen]." *In re Forever Green Athletic Fields, Inc.*, 500 B.R. 413, 427 (Bankr. E.D. Pa. 2013). In the weeks after Dawson obtained the consent judgment in the Louisiana Action, he filed a motion to terminate Forever Green's arbitration proceedings against ProGreen, which arose from the separate Bucks County Action and sought $5 million in damages. Light on meritorious arguments, Dawson's plan was to use the consent judgment to garnish the arbitrator's fees, thereby forcing the arbitrator to halt the arbitration. Dawson and his counsel said they would keep the arbitration suspended until Forever Green paid on the consent judgment. They also threatened to file an involuntary petition unless Forever Green agreed to stop the proceedings. Keeping his word, Dawson filed an involuntary petition after Forever Green tried to reinstate the arbitration.

As the Bankruptcy Court found, Dawson's actions ran counter to the spirit of collective creditor action that should animate an involuntary filing. He put his own interests above all others. By trying to end the arbitration, Dawson was obstructing Forever Green from pursuing its largest asset, the potential proceeds of which Forever Green could have used to pay its creditors. He was also using the bankruptcy process to exert pressure on Forever Green to pay the consent judgment without regard to Forever Green's other creditors, many of which had higher priority claims. Courts routinely find it improper for creditors to use the bankruptcy courts to gain a personal advantage in other pending actions or as a debt-

16

collection device.[7]

Nor is there any evidence that Dawson engaged in the type of due diligence and sober decision-making process that should precede any involuntary filing. Instead, the suspicious timing of Dawson's filing—days before his responsive brief was due in the Philadelphia Action—and his threatening comments to Day suggest he was just using bankruptcy as an alternative weapon for stopping the arbitration and cashing in on the consent judgment. If Dawson had done an investigation prior to filing, he would have learned that Forever Green was not making preferential payments to its creditors. Although Day was using his personal assets to pay some of Forever Green's creditors who also happened to be his creditors, the Dawsons offer no argument as to why we should attribute these payments to Forever Green. Further absent from the record is any evidence of Forever Green's

---

[7] *See, e.g.*, *In re Nordbrock*, 772 F.2d 397, 400 (8th Cir. 1985) ("A creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt."); *In re Tichy*, 332 B.R. at 374 ("Bad faith has been found to exist when a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures."); *In re WLB-RSK Venture*, 296 B.R. 509, 515 (Bankr. C.D. Cal. 2003) ("[Creditor] filed this involuntary petition against the alleged debtor as a litigation tactic . . . ."); *In re Silverman*, 230 B.R. at 53 ("Filing an involuntary petition with the intent to gain a strategic advantage . . . constitutes an improper purpose."); *In re Dami*, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994) ("Where the purpose of the bankruptcy filing is to defeat state court litigation without a [bankruptcy] purpose, bad faith exists.").

assets depleting. The only supposed evidence of asset dissipation is Forever Green's prosecution of its claims against ProGreen. But Forever Green is not even footing the bill for any of its litigation—Day is. And more importantly, as the Bankruptcy Court said, it is difficult to "credit[] the notion that the pursuit of Forever Green's only asset that may yield a meaningful recovery to its creditors can be characterized as a dissipation of estate assets. To the contrary, the very act of prosecuting this claim would be instrumental to the marshaling of assets integral to any bankruptcy administration." *In re Forever Green*, 500 B.R. at 429-30. Accordingly, the record supports the Bankruptcy Court's decision to dismiss the petition as a bad-faith filing.

## C.

The Dawsons' final argument is that, even if Charles Dawson acted in bad faith, other good-faith creditors should have been given the chance to cure the petition. This argument arises from 11 U.S.C. § 303(c), which provides that "[a]fter the filing of a petition . . . but before the case is dismissed or relief is ordered" other creditors may join the petition. This provision provides for joinder of creditors as a matter of right. *See In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. 906, 907-08 (Bankr. D. Del. 2010).

An interesting question percolating in the courts is the application of the so-called "bar to joinder" rule. Under this rule, a petition that was filed in bad faith cannot be saved by joining good-faith creditors under § 303(c) prior to dismissal. Most courts find this type of curing impermissible and would

18

dismiss such a petition.[8]  A growing minority, however, find this rule unjustified because it blindly lumps good- and bad-faith filers together and needlessly punishes everyone.[9]  The Dawsons would like us to adopt the latter view and allow their petition to be cured.

We need not take a stance on this issue because, even if we found the "bar to joinder" rule misguided, it is too late for any creditor to save the petition.  The text of § 303(c) allows creditors to join a petition "before the case is dismissed."  In the cases discussing the "bar to joinder" rule, creditors actually sought to join the involuntary petition prior to dismissal.  The courts had to decide whether to dismiss the petition because of a bad-faith creditor even though other creditors, if allowed to join, could have cured the deficiencies.  By contrast, there is no evidence here that any creditor tried to join the petition before the case was

---

[8] *See, e.g.*, *Basin Elec. Power Coop. v. Mw. Processing Co.*, 769 F.2d 483, 486 (8th Cir. 1985); *In re Mylotte, David & Fitzpatrick*, No. 07-11861, 2007 WL 2033812, at *9 (Bankr. E.D. Pa. July 12, 2007); *In re R & A Bus. Assocs., Inc.*, No. 99-2171, 1999 WL 820859, at *2 (E.D. Pa. Oct. 14, 1999); *In re Centennial Ins. Assocs., Inc.*, 119 B.R. 543, 546-47 (Bankr. W.D. Mich. 1990).

[9] *See, e.g.*, *Fetner v. Haggerty*, 99 F.3d 1180, 1181 (D.C. Cir. 1996) (per curiam); *In re Hrobuchak*, No. 5-14-bk-02098-JJT, 2015 WL 1651074, at *1 (Bankr. M.D. Pa. Apr. 8, 2015); *In re Houston Reg'l Sports Network, L.P.*, 505 B.R. 468, 477 (Bankr. S.D. Tex. 2014); *In re FKF*, 435 B.R. at 908; *In re Kidwell*, 158 B.R. 203, 207 (E.D. Cal. 1993).

dismissed, leaving only two good-faith creditors when the statute requires three.  And there was plenty of time for Kelli Dawson or Cohen Seglias to recruit other potentially curing creditors—approximately nine months lapsed between the hearing on the motion to dismiss and the issuance of the Bankruptcy Court's decision.  Section 303(c), therefore, provides no aid to the Dawsons.  *See In re DSC, LTD.*, 486 F.3d 940, 948 (6th Cir. 2007) (explaining that the language of § 303(c) "means that a would-be joining creditor must join, if at all, before the Court has dismissed an involuntary petition." (internal quotation marks omitted)).

### III.

For the foregoing reasons, we will affirm the order of the District Court.