NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-3057, 19-3058, 19-3059, 19-3254, and 19-3255
_____

In re:  NATIONAL MEDICAL IMAGING, LLC;
NATIONAL MEDICAL IMAGING HOLDING COMPANY, LLC,
Debtors

NATIONAL MEDICIAL IMAGING, LLC;
NATIONAL MEDICAL IMAGING HOLDING COMPANY, LLC,
Appellants in 19-3057, 19-3058 and 19-3059

v.

U.S. BANK, N.A.; LYON FINANCIAL SERVICES, INC.,
d/b/a U.S. Bank Portfolio Services; DVI RECEIVABLES XIV, LLC;
DVI RECEIVABLES XVI, LLC; DVI RECEIVABLES XVII LLC;
DVI RECEIVABLES XVIII, LLC; DVI RECEIVABLES, XIX LLC;
DVI FUNDING, LLC; ASHLAND FUNDING, LLC; JANE FOX

Ashland Funding, LLC,
Appellant in 19-3254

U.S. Bank, N.A.; Lyon Financial Services, Inc.;
DVI Receivables XIV, LLC; DVI Receivables XVI, LLC;
DVI Receivables XVII, LLC; DVI Receivables XVIII, LLC ;
DVI Receivables XIX, LLC; DVI Funding, LLC; Jane Fox,
Appellants in 19-3255
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2-15-mc-0146, 2-15-mc-0147 and 2-16-cv-5044)
District Judge:  Hon. Cynthia M. Rufe
_____

Originally Submitted Under Third Circuit LAR 34.1(a)
June 11, 2020
Resubmitted August 25, 2020

Before:   JORDAN, MATEY, and ROTH, *Circuit Judges.*

(Filed: August 25, 2020)

_____

OPINION[*]

_____

JORDAN, *Circuit Judge.*

After more than a decade of litigation, Appellants National Medical Imaging, LLC and National Medical Imaging Holding Co., LLC (collectively, "NMI") seek review of the District Court's grant of summary judgment in favor of Appellees U.S. Bank, N.A., Ashland Funding LLC ("Ashland"), Lyon Financial Services, Inc. ("Lyon") (now part of U.S. Bank), DVI Receivables XIV, LLC, DVI Receivables XVI, LLC, DVI Receivables XVII, LLC, DVI Receivables XVIII, LLC, DVI Receivables XIX, LLC  (collectively, "DVI entities"), and Jane Fox, the Director of Operations for Lyon (collectively, "the creditors").  The District Court held that the creditors were not liable for damages under 11 U.S.C. § 303(i)(2) for bringing an involuntary bankruptcy action in bad faith.  We agree with the District Court that, even if the creditors acted in bad faith, NMI cannot prove the involuntary bankruptcy caused NMI's failure.  We thus do not reach the creditors' cross-appeal and will affirm the District Court's grant of summary judgment to the creditors.  Our affirmance renders moot an earlier-filed motion for an injunction, so we will also deny that motion.

_____

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

## I.    BACKGROUND

### A.    Factual Background

As we have remarked before in a related case, "[i]t is an understatement to say that the factual background and procedural history lurking behind this case are complex." *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 416 (3d Cir. 2016). Nevertheless, a brief summary of the facts relevant to this appeal may suffice.

NMI operated centers that provided medical imaging services, such as MRI, CT, and PET scanning. The company ran into financial difficulties that Maury Rosenberg, the managing owner of NMI, attributed to the Deficit Reduction Act of 2005.[1] From 2005 through 2007, NMI experienced a decline in the volume of scans by 16%. During the year 2007 alone, there was a decline of 19%. NMI was also already involved in litigation with U.S. Bank, during which Jane Fox, a named defendant in this case and, at the time, the Director of Operations for U.S. Bank, encouraged an aggressive legal strategy that included "out fil[ing]" NMI – meaning, it seems, to one-up NMI in the filing of legal documents. (App. 560.)

By October 2008, NMI had closed all its centers outside of Pennsylvania. In an email to employees, an NMI representative said that "the Deficit Reduction Act severely affected the diagnostic imaging business" and that they should "work together to increase our Pennsylvania viability." (App. at 576.) By that point, NMI was also experiencing strained relations with its primary lender, Sterling Bank. According to that bank, NMI

---

[1] The Deficit Reduction Act of 2005, Pub. L. 109-171, 120 Stat. 4 (2006), affected the amounts that Medicare would pay for imaging services. *See* 42 U.S.C. § 1395w-4.

had "maxed out [its] credit line[,]" and there was "not a chance" it would further extend credit to NMI.  (App. at 1437.)

On November 3, 2008, an employee of a U.S. Bank affiliate who worked with NMI forwarded Rosenberg an email about a potential purchaser for NMI.  In response, Rosenberg said he didn't "believe that there [was] anything to talk about" because, "as previously discussed, we are in the process of closing all of the centers a-n [sic] this process should be completed no later than 12/15/08[.]"  (App. at 1682.)  Shortly after receiving that email, the company's creditors, led by U.S. Bank, filed involuntary bankruptcy petitions on November 7, 2008 against NMI and Rosenberg in the United States District Court for the Eastern District of Pennsylvania.

### B.     Procedural History

After the involuntary bankruptcy petitions were filed, the action against Rosenberg was moved to the United States District Court for the Southern District of Florida, where he resides.  That bankruptcy petition was dismissed in August 2009.  The petition against NMI was also subsequently dismissed, based on collateral estoppel principles and the decisions in the Rosenberg bankruptcy.

Both NMI and Rosenberg brought separate adversary actions against the creditors, relying on 11 U.S.C. § 303(i)(2).  The Rosenberg claim went to a jury trial, and the jury found bad faith on the part of the creditors in bringing the involuntary bankruptcy and awarded a total of $6.12 million in damages.  Meanwhile, NMI pursued an adversary action against the creditors in the Eastern District of Pennsylvania.  That case underlies the present appeal.  In early motions practice, NMI claimed it was entitled to a trial by

4

jury for its claim under 11 U.S.C. § 303(i)(2), but the creditors countered that NMI had signed a settlement agreement waiving that right. The District Court agreed that NMI was entitled to a jury trial with respect to those creditors that were not parties to the settlement agreement or the successors or agents of any such party. The effect of that ruling was overtaken, however, by the parties' motions for summary judgment.

NMI sought partial summary judgment, arguing that preclusive effect should be given to the jury's finding in the Southern District of Florida that the creditors acted in bad faith in filing an involuntary bankruptcy against Rosenberg. The District Court denied that motion. The creditors filed for full summary judgment, saying NMI could not prove bad faith, as required under § 303(i)(2), and that, even if it could, their bad faith actions did not cause NMI to go out of business.

The District Court held that "[t]here are limited indicia of bad faith, which preclude any determination on that issue as a matter of law…. Yet, the evidence relating to bad faith does not rise to a level that would merit punitive damages, especially considering NMI's severe financial distress." *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*, No. 16-5044, 2019 WL 4076768, at *4 (E.D. Pa. Aug. 28, 2019) ("*SJ Opinion*"). It also held that NMI was not entitled to compensatory damages because "the record establishes that NMI's financial difficulties were caused by factors independent of the involuntary bankruptcy petitions, and thus there is no genuine dispute of material fact on the issue of proximate cause." *Id.*

5

NMI timely appealed the grant of summary judgment in favor of the creditors and the denial of its own motion for partial summary judgment.[2]  After briefing was almost concluded, NMI sought an injunction from this court to stop an auction scheduled to occur on June 15, 2020, in which U.S. Bank could have endeavored to purchase NMI's chose in action – this appeal – and thereafter terminate the appeal, thus finally closing the case.

## II.    Discussion[3]

NMI argues that, for three reasons, the District Court erred in granting summary judgment.  First, it says that determining whether the creditors acted with bad faith sufficient to justify punitive damages is a fact-intensive inquiry for a jury to decide and not appropriate for summary judgment, especially when the Court did not grant summary

---

[2] NMI also appealed the ruling that it had waived its right to a jury trial with certain defendants based on an earlier settlement agreement with U.S. Bank.  Ashland and the DVI entities cross-appealed, arguing that, if we decide that the District Court erred in granting summary judgment in their favor, we should also find that the District Court erred in determining that NMI was entitled to a jury trial.  The jury issue is irrelevant, however, given our disposition of this appeal, so we do not address it.

[3] The bankruptcy court had jurisdiction under 28 U.S.C. § 157, and the District Court had jurisdiction over the adversary proceeding under 28 U.S.C. § 1334.  We have jurisdiction under 28 U.S.C. § 1291.  We review a district court's grant or denial of summary judgment *de novo*, applying the same standard that the district court applied. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  Under that standard, a party is entitled to summary judgment if it can establish that "there is no genuine dispute as to any material fact[,]" and it "is entitled to judgment as a matter of law[.]" *Id.* (quoting Fed. R. Civ. P. 56).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

judgment on the issue of bad faith.[4]  Second, NMI relatedly argues that the District Court erred in denying its motion for partial summary judgment on the issue of bad faith based on collateral estoppel principles.  Finally, NMI asserts that there are disputes of material fact as to whether the involuntary bankruptcy caused NMI to cease operations, so summary judgment was inappropriate.  We are unpersuaded and instead agree with the District Court that, even if the creditors acted with some degree of bad faith, they are entitled to summary judgment because their behavior was not such as to warrant punitive damages and NMI cannot prove the involuntary bankruptcy proximately caused it any harm.

### A.  Punitive Damages

The District Court granted the creditors' motion for summary judgment on the punitive damages issue because it determined that NMI's proof of bad faith, even if accepted as true, was not sufficient to show that the creditors did anything bad enough to warrant an award of punitive damages.  On appeal, NMI argues that, before the Court addressed punitive damages, a jury should have addressed the question of bad faith, which is a fact-intensive inquiry.

---

[4] As noted above, NMI sought partial summary judgment on the issue of bad faith, asking the District Court to apply collateral estoppel principles to the jury's finding in the Southern District of Florida.  The District Court denied that motion, and NMI appeals it here.  We do not address that portion of the appeal, however, because we are accepting, for the sake of argument, that the creditors acted with some degree of bad faith.

Under 11 U.S.C. § 303(i)(2)(B), a court "may" grant punitive damages.[5] "The key word in section 303(i) is 'may'; that is, the court has considerable discretion in deciding to award … damages under 303(i)(2). … An award of punitive damages is discretionary even when the involuntary filing is found to have been in bad faith." 2 Collier on Bankruptcy ¶ 303.33 (16th ed. 2020). Bad faith is determined by examining the totality of the circumstances. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015). Courts may consider a variety of factors in determining bad faith,

> including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*Id.* Although the only statutory prerequisite for punitive damages is that the involuntary petition was filed in bad faith, "Congress … chose to reserve to the court the power to withhold an award in certain rare circumstances." *In re Reid*, 854 F.2d 156, 160 (7th Cir. 1988). So, while "the presence or absence of bad faith will inform the exercise of the district court's discretion under § 303(i)[,]" it is not the only consideration. *Id.* The

---

[5] Despite the language of the statute directing that "the court may grant … punitive damages[,]" NMI argues that, because the District Court withdrew the reference and determined that NMI's § 303(i)(2) claim would be heard by a jury, the Court had intended that the jury, not the Court, would decide whether to grant punitive damages. We will assume, for the sake of argument, that that may have been the District Court's initial intent.

8

purposes of punitive damages under § 303(i) are the same as in other contexts: "punishment and deterrence." *In re Landmark Distribs., Inc.*, 189 B.R. 290, 317 (Bankr. D.N.J. 1995).

NMI's central argument is that whether punitive damages are justified is inextricably tied to the facts that indicate bad faith. In NMI's view, since the District Court did not decide the issue of bad faith, it could not have rightly decided the issue of punitive damages. NMI also claims that it need not prove harm to receive punitive damages, eliminating the causation hurdle it faces for compensatory damages. *See In re S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456, 465 (9th Cir. 2010) ("We … hold that punitive damages may be awarded under § 303(i)(2)(B) even absent an award of actual damages under § 303(i)(2)(A).").

According to NMI, the creditors had improper motives in filing the involuntary bankruptcy, as demonstrated by Fox's email about "outfil[ing]" NMI. That email, written to two other U.S. Bank employees a month before the involuntary bankruptcy was contemplated or filed, questioned whether U.S. Bank's attorney in a separate state proceeding against NMI was sufficiently aggressive. Fox wrote,

> You have told me in the past that what you know about [Rosenberg] is that he does not conduct business above the table and is know [sic] to due [sic] business is [sic] rough areas. [K]nowing this and knowing that he will pull out all legal and questionable tactics, I really need you to make sure that [our attorney] is a street fighter.

(App. 560.) She then wrote that she did not think their attorney understood that he needed to "out file" Rosenberg "and not sit back and let things just go through the court systems." (App. at 560.) NMI also points out that the creditors did not request an interim

9

trustee during the involuntary bankruptcy, despite their having represented that was a key purpose for initiating the involuntary proceedings, and that some of the DVI entities that were listed as creditors were no longer in business when the petition was filed. *See In re Rosenberg*, 414 B.R. 826, 837 (Bankr. S.D. Fla. 2009).

Even if those facts are taken at face value and as indicating bad faith, we cannot say that the District Court erred in concluding, in effect and in light of the totality of the circumstances and "the policy surrounding § 303(i)(2)", that no reasonable jury would grant punitive damages. *SJ Opinion*, 2019 WL 4076768, at *11. Fox's email is certainly suggestive of an aggressive litigation strategy, but, on this record, it does not constitute evidence warranting an award of punitive damages. Nor does the fact that the District Court dismissed the involuntary bankruptcy as improperly filed mean that NMI is necessarily entitled to punitive damages, even given what was characterized by the District Court as the creditors' "negligent and hasty approach" to filing the involuntary bankruptcy. *Id.*, at *10. That is especially true when considering the context of the petition's filing; Rosenberg had just told U.S. Bank that he planned to cease operations and was in the process of doing so. On the record here, the District Court did not err in determining that there was no reasonable basis for awarding punitive damages.

## B. Compensatory Damages

NMI also argues that the District Court overlooked disagreements on material facts pertaining to causation. Section 303(i)(2)(A) of the Bankruptcy Code requires that any damages for which defendants may be liable be "proximately caused" by the filing of the involuntary bankruptcy. The statute does not define proximate cause, so the common

10

law definition applies. *Field v. Mans*, 516 U.S. 59, 69-70 (1995). Under general common law principles, proximate cause requires that the filing be a "'substantial factor' in bringing about the plaintiff's harm." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d. Cir. 2009).

Bankruptcy courts have held that when a business was failing before the filing of the involuntary bankruptcy, compensatory damages may not be justified. *See In re Cannon Express Corp.*, 280 B.R. 450, 460-61 (Bankr. W.D. Ark. 2002) (not awarding compensatory damages because the debtor "was already experiencing an economic downturn in its business" before the involuntary bankruptcy petition, so the court could not determine what portion, if any, of the damage was proximately caused by the petition); *In re Atlas Mach. & Iron Works, Inc.*, 190 B.R. 796, 804 (Bankr. E.D. Va. 1995) ("Although compensatory damages may include loss of business during and after the pendency of the case, the undisputed evidence indicated that [the] business and work force had been on the wane for the past ten years. … Consequently, any additional loss of business following the filing of the petition is purely speculative and therefore, is not compensable.") (collecting cases). Although reputational harm can be cognizable, "[a]sserting that the stigma of bankruptcy damaged a debtor's business reputation and hurt goodwill is not, in and of itself, sufficient evidence. There must be evidence supporting a damage claim." 2 Collier on Bankruptcy § 303.33.

Despite Rosenberg's clear and contemporaneous statements to the contrary, NMI claims that it was not planning to close its centers before the involuntary bankruptcy was filed. It also says that the involuntary bankruptcy ruined its reputation with physicians

11

and its primary lender. NMI first points to deposition testimony from an NMI employee who said there had been "hubbub talk" at referral centers about the involuntary bankruptcy, so doctors were no longer referring patients to NMI for imaging services. (App. at 937.) But that employee also admitted that none of the referring physicians mentioned the involuntary bankruptcy. NMI further points to the email it sent to employees in October 2008, after closing centers in Maryland and Illinois. That email told employees that the company had been forced to close the centers in Maryland and Illinois because "the Deficit Reduction Act severely affected the diagnostic imaging business," and the message encouraged employees to "work together to increase our Pennsylvania viability." (App. at 576.) NMI says that the email is evidence of "a decision by NMI to restructure" and that statements by Rosenberg to the contrary were "taken out of context." (Opening Br. at 39.) Finally, NMI notes that the involuntary bankruptcy constituted an event of default under the terms of its loan from its primary lender, Sterling Bank.

Even when taken in the light most favorable to NMI, the evidence does not prove causation. No reasonable jury would credit unsubstantiated rumors as evidence, rumors that were, in any event, likely to be ruled inadmissible hearsay. And that is all the NMI employee could have provided. The email to employees confirms rather than refutes that NMI was experiencing severe financial difficulties before the involuntary bankruptcy. In light of Rosenberg's unambiguous statement that he planned to close all of the imaging

centers by December 15, 2008, the email cannot fairly be read as a call to restructure the business.

Indeed, there can be little doubt that NMI was on the brink of failure when the involuntary bankruptcy petition was filed. According to Rosenberg's contemporaneous reports, NMI had experienced a dramatic decline in business. Rosenberg consistently blamed the Deficit Reduction Act for those declines. Although NMI identifies one loan on which it defaulted as a result of the involuntary bankruptcy, it does not dispute the evidence showing that it had already "maxed out [its] credit line" with its primary lender, and that the bank said there was "not a chance" it would have further extended credit to NMI, even without the involuntary bankruptcy. (App. at 1437.) Because the involuntary bankruptcy petition was filed when NMI was already in irreversible decline – by all appearances on the precipice of complete collapse – the petition was not the proximate cause of the business's failure. A reasonable jury could not find otherwise.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of the creditors. Because our affirmance of that judgment concludes this case, the motion for an injunction is moot.