In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 16-1362

CHRISTOPHER COLBERT and JAI CRUTCHER,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

―――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cv-2397 — **Robert M. Dow, Jr.**, *Judge*.

―――――――――

ARGUED NOVEMBER 29, 2016 — DECIDED MARCH 14, 2017

―――――――――

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs-appellants Christopher Colbert and Jai Crutcher were arrested after a search of their apartment, in which police officers and parole agents found an unregistered firearm and ammunition. After Colbert's and Crutcher's acquittals and dismissal of the gun-possession charges, plaintiffs-appellants brought malicious-prosecution,

Fourth Amendment, and false-arrest claims against the officers and the City of Chicago. The district court granted summary judgment in defendants-appellees' favor. We affirm.

## I. Background

From 2002 to 2010, Jai Crutcher was incarcerated for robbery, unlawful use of a weapon by a felon, aggravated discharge of a firearm at an occupied vehicle, and mob action. In December 2010, Crutcher was released; however, he returned to prison in January 2011 for domestic battery. In March 2011, he was discharged on mandatory supervised release.[1] On March 17, 2011, Crutcher and his girlfriend moved in with Colbert, Crutcher's brother by adoption.

In late March 2011, Chicago Police Department Officer Russell Willingham and his partner received a tip from an informant who reported that he had been at Crutcher's residence on multiple occasions and had observed Crutcher in possession of a forty-caliber semiautomatic handgun and a twelve-gauge shotgun. Officer Willingham ran a name check on Crutcher and saw that he was on mandatory supervised release. Officer Willingham then contacted the Illinois Department of Corrections ("IDOC") and spoke with parole agent

---

[1] The terms of Crutcher's release required him to "refrain from possessing a firearm or other dangerous weapon," "consent to a search of [his] person, property, or residence under [his] control," and "comply with any additional conditions the Prisoner Review Board has or may set as a condition of [his] parole or mandatory supervised release including, but not limited to: ELECTRONIC MONITORING FOR DURATION." Crutcher's electronic-monitoring condition further mandated that he "not use or knowingly have under [his] control or in [his] residence any firearms, ammunition, or explosive devices" and subjected his "host site" to search for "any reason and at any time."

Jack Tweedle. Willingham relayed the informant's report to Tweedle, and both decided to perform a compliance check at Crutcher's residence.

At 6:30 AM on March 31, 2011, at least ten law-enforcement officials—including defendants-appellees Officer Willingham and parole agents Tweedle, Darryl Johnson, and Louis Hopkins, as well as several others not named in the lawsuit—reported to Crutcher's residence. Crutcher woke up to the officers' knock at the door, noticed the officers out front, and called Colbert, who was at work. Crutcher took several minutes to let the officers in. Once Crutcher opened the door, the officers informed him that they were there to conduct a parole check. Crutcher consented to the search as required under the terms of his supervised release.

Before beginning the search, the officers handcuffed Crutcher. Soon afterward, Colbert returned home from work. The officers informed Colbert that they were conducting a compliance check and handcuffed Colbert, as well. Neither Crutcher nor Colbert was permitted to observe the search, which encompassed the basement, kitchen, and various bedrooms.

In his complaint, Colbert alleged that, during their search, the officers caused damage throughout his house. Specifically, he claimed the officers "pulled out insulation, put holes in the walls, ripped the couch open to search its contents, and tracked dog feces throughout the house." He further alleged that the officers ruined part of the kitchen countertop and broke hinges off of certain shelves. Colbert did not provide any evidence of the residence's pre-search condition. He was also unable to identify any of the officers who allegedly damaged his property.

While searching Colbert's house, the officers encountered a locked bedroom door on the main floor. Colbert informed the officers that it was his bedroom. According to Colbert, one of the IDOC agents then wrestled him to the ground and took the keys to the room. The officers found a twelve-gauge shotgun and approximately one hundred rounds of ammunition in the bedroom closet. The shotgun was not registered with the City of Chicago. The officers also discovered a case for a forty-caliber semiautomatic handgun, but they did not recover the gun itself. Colbert admitted that he owned both firearms. The officers arrested both Crutcher[2] and Colbert.

Later, Officer Willingham submitted a criminal complaint against Crutcher, alleging that Crutcher had possessed a firearm as a felon, in violation of 720 Ill. Comp. Stat. 5/24–1.1(a), and had violated his parole, *see* 730 Ill. Comp. Stat. 5/3–3–9. Both charges required Crutcher to have known about the firearms in the house. Officer Willingham's arrest report stated, in relevant part:

> After being Mirandized and waiving said rights, [Crutcher] stated that he had full knowledge of the firearm being in the residence but stated that it was OK because it was his brother's, and he's legit … . [A]s to the fact that a .40 cal semiauto handgun previously had been in the residence … [Colbert] stated [it] was his but [that it was] currently at a friend's house in Matteson.

---

[2] Crutcher does not challenge the district court's ruling that he was legally arrested.

According to Crutcher, however, Officer Willingham's statement was false: Crutcher had informed Officer Willingham that the shotgun was not his and that he did not know that Colbert had a firearm in the house. On April 19, 2011, the Cook County trial court dismissed the criminal complaint on a finding of no probable cause.[3]

In May 2011, an Illinois grand jury indicted Crutcher on one count of being an armed habitual criminal and two counts of unlawful possession of a firearm by a felon. On February 28, 2012, a jury found Crutcher not guilty.

As for Colbert, Officer Willingham submitted in an affidavit that the officers arrested him for (1) failing to register his firearm pursuant to § 8-20-140 of Chicago's Municipal Code, and (2) using a shotgun able to hold over three rounds, in violation of 520 Ill. Comp. Stat. 5/2.33(m).[4] Colbert's official charge, however, mistakenly identified § 8-20-040 as the ordinance underlying the charges.[5] According to Officer Willingham, the discrepancy was due to a scrivener's error. Colbert was released from custody on the same day of his arrest, and the charges against him were later dismissed.

Appellants subsequently filed this lawsuit. Crutcher alleged that Officer Willingham and the City of Chicago had both subjected him to malicious prosecution under Illinois law. Colbert alleged that (1) the named officers and agents

---

[3] The court did not provide its reasoning for this finding.

[4] Neither party disputes the notion that Colbert's possession amounted to "use" under the statute. Regardless, it is not relevant for the purposes of the issues on appeal.

[5] Section 8-20-040 prohibits possessing more than one assembled and operable firearm per licensed owner in a home.

had violated his Fourth Amendment rights, and (2) the City of Chicago had falsely arrested him. The district court granted defendants-appellees' motion for a more definite statement regarding Colbert's and Crutcher's claims against the City. Specifically, the district court ordered Colbert and Crutcher to identify any allegedly unconstitutional ordinance that formed the basis of their claims. Appellants filed an amended complaint, identifying § 8-20-040 (the ordinance mistakenly listed in the official charge) as the allegedly unconstitutional ordinance at issue. The City then moved to dismiss the claims against it, arguing that Officer Willingham had arrested Colbert for violating § 8-20-140, not § 8-20-040. The district court denied the City's motion. Appellants then filed a second amended complaint that continued to identify § 8-20-040 as the only allegedly unconstitutional ordinance at issue.

The City of Chicago and Officer Willingham moved for summary judgment, as did IDOC agents Tweedle, Johnson, and Hopkins. Colbert and Crutcher moved for partial summary judgment on their false-arrest claim against the City. They also, for the first time, asserted that the registration requirements under § 8-20-140—the ordinance actually underlying Colbert's arrest—were unconstitutional. In response, Officer Willingham submitted an affidavit stating that Colbert had been arrested for violating § 8-20-140, but Officer Willingham had erroneously marked § 8-20-040 as the cause for arrest. The district court accepted this explanation, granted summary judgment for defendants-appellees on all claims, denied Colbert's and Crutcher's motion for partial summary judgment, and dismissed the case. This appeal followed.

## II. Discussion

We review the district judge's grant of summary judgment de novo, viewing all facts in favor of the nonmoving party. *Georgia-Pac. Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011).

### A. Malicious Prosecution[6]

Crutcher brought state-law claims for malicious prosecution against the City and Officer Willingham under supplemental jurisdiction, pursuant to 28 U.S.C. § 1367.[7] "To establish a claim for malicious prosecution under Illinois law,

---

[6] The district court treated Crutcher's underlying criminal proceedings as two separate actions: (1) Officer Willingham's criminal complaint, which the state court dismissed on April 19, 2011, after finding no probable cause, and (2) the State's grand-jury indictment, which ended with a not-guilty jury verdict on February 28, 2012. Crutcher first raised his malicious-prosecution claims on November 29, 2012; so the district court concluded that Crutcher's claims arising out of the first criminal proceeding were untimely. The court subsequently determined that Crutcher's claims regarding the second proceeding lacked evidence of malice. Crutcher argues that the district court erroneously split the underlying criminal proceedings. He maintains he was subjected to one continuous criminal proceeding that ended with the February 2012 not-guilty verdict. Thus, he concludes, his claims were all timely and included the necessary allegations, including malice.

Regardless of whether Crutcher's criminal proceedings are properly understood as one or two actions, defendants-appellees were entitled to judgment as a matter of law on Crutcher's malicious-prosecution claims. Because we conclude that these claims fail even if we treat his underlying criminal proceedings as one continuous proceeding, we do not address the question of when a proceeding is "terminated" for the purposes of malicious prosecution in Illinois.

[7] The Supreme Court is currently considering whether to recognize a federal constitutional claim for malicious prosecution under the Fourth

plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding [by the defendant]; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016) (citing *Sang Ken Kim v. City of Chi.*, 858 N.E.2d 569, 574 (Ill. App. 2006)). "The absence of any one of these elements bars a plaintiff from pursuing the claim." *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)).

The fact that Crutcher was indicted by a grand jury defeats his claim. Noting that "a malicious prosecution action against police officers" can often be "anomalous," we have explained,

> [T]he State's Attorney, not the police, prosecutes a criminal action. It is conceivable that a wrongful arrest could be the first step towards a malicious prosecution. However, *the chain of causation is broken by an indictment*, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor.

*Reed v. City of Chi.*, 77 F.3d 1049, 1053 (7th Cir. 1996) (emphasis added). Thus, a plaintiff may not maintain a malicious-prosecution claim against an arresting officer without first showing

---

Amendment. *See Manuel v. City of Joliet*, 590 F. App'x 641 (7th Cir. 2015), *cert. granted*, — U.S. —, 136 S. Ct. 890 (2016). The Court heard oral argument in *Manuel* on October 5, 2016. Crutcher argues that, in the event the Supreme Court recognizes such a claim, he should be able to raise it on remand. As explained below, however, Crutcher's claims fail regardless.

"some postarrest action which influenced the prosecutor's decision to indict." *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001). While Officer Willingham's allegedly false statement constitutes a post-arrest action, there is no evidence that it influenced the prosecutor's decision to indict, or that the prosecutor relied on it to obtain the indictment. It is likely the prosecutor knew that a judge had already dismissed Officer Willingham's complaint, which was based in part on this arrest report, for lack of probable cause. In fact, Officer Willingham did not testify before the grand jury—Officer Berry, one of the other nine searching officers, did. And there is no evidence connecting Officer Willingham's allegedly false report to Officer Berry's grand-jury testimony. Without more, there is no basis to infer that Officer Willingham's allegedly false report precluded the grand-jury indictment from breaking the chain of causation between Crutcher's arrest and prosecution. Consequently, Crutcher's malicious-prosecution claim against Officer Willingham fails.

Crutcher relies on our decisions in *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009), and *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003), to argue that an indictment does not break the chain of causation when the defendant officer includes false statements in his or her report. Neither of these cases, however, addressed the effect that an intervening indictment can have on a malicious-prosecution claim against a police officer. Rather, they concluded that the appellants could not succeed on federal due-process claims based on allegedly false police statements that were better suited for state-law malicious prosecution claims.

Crutcher's malicious-prosecution claim against the City fails for the same reason and because it does not meet certain standards governing actions against municipalities. To succeed on a direct claim against a municipality, Crutcher must identify "a policy or custom of the municipality that violates the plaintiff's constitutional rights." *Schor v. City of Chi.*, 576 F.3d 775, 779 (7th Cir. 2009). To do so, he "must begin by showing an underlying constitutional violation." *Id*. Crutcher does not make such a showing. He argues that §§ 8-20-040 and 8-20-140 of Chicago's Municipal Code are unconstitutional. But § 8-20-040 is unrelated to this case: It only appears in the criminal complaint as the result of a scrivener's error and was not the basis for Crutcher's arrest or prosecution. Furthermore, Crutcher improperly introduced his argument regarding § 8-20-140 in his response to summary judgment. *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 814 ("It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion.")

**B.  Fourth Amendment**

Colbert brought § 1983 claims against the named officers and agents for violating his Fourth Amendment rights during the search. "To survive summary judgment of a claim brought under § 1983, this court focuses on '(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Armato v. Grounds*, 766 F.3d 713, 719–20 (7th Cir. 2014) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). Defendants-appellants clearly acted under state law, as they are employed by the Chicago Police Depart-

ment and Illinois Department of Corrections and were enforcing state-law conditions of supervised release. *See id.* at 720. Colbert must also show, however, that a reasonable trier of fact could find that the officers' and agents' conduct deprived him of his Fourth Amendment rights. *See id.*

### 1.  *Searches of Colbert's Person and Bedroom*

In the second amended complaint, Colbert brought a Fourth Amendment property-damage claim, alleging in relevant part, "On March 31, 2011, defendants Willingham, Tweedle, Johnson, and Hopkins … searched the residence of plaintiff Colbert in an unreasonable manner, causing damage to Colbert's property."

In his response at summary judgment, and now on appeal, Colbert argues that this language supports allegations that the officers searched his person with unreasonable force (and thus, after taking his keys, entered his bedroom unlawfully). Such a reading stretches the complaint's language too far. In *Whitaker*, we recognized the principle that "a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014). Specifically, we held that parties cannot "add entirely new factual bas[e]s … not previously presented." *Id*. We stressed, "It is factual allegations, not legal theories, that must be pleaded in a complaint." *Id*. Here, Colbert does not allege sufficient facts to support his alternate Fourth Amendment claims regarding his person and bedroom. Rather, these allegations require factual bases not adequately pled in the complaint.

Colbert counters that various facts presented throughout the depositions touch on these two new issues. Therefore, he concludes, no new factual bases were required to put the parties on notice. "[A] court will not imply a party's consent to try an unpleaded claim," however, "merely because evidence relevant to a properly pleaded issue incidentally tends to establish [that] unpleaded claim." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) (citation and internal quotation marks omitted). Colbert did not adequately plead his claims regarding the search of his person and bedroom, and introducing them in his response to defendants-appellants' motion for summary judgment was not sufficient to survive that motion.

### 2. *Property Damage*

Colbert also claims that the named officers and agents damaged his property while conducting the search. As noted above, Colbert alleged the following: "On March 31, 2011, defendants Willingham, Tweedle, Johnson, and Hopkins … searched the residence of plaintiff Colbert in an unreasonable manner, causing damage to Colbert's property." "[T]he Fourth and Fourteenth Amendments provide a remedy when a citizen's property is unreasonably damaged during a search." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression.")). "[I]ndividual liability under § 1983," however, "requires personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (citation and internal quotation marks omitted). The

plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation … . A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.").

Colbert is unable to satisfy § 1983's personal-responsibility requirement at summary judgment. He sued four of ten searching officers, alleging that they had caused property damage. However, he later admitted that he was unable to identify which of the ten searching officers had caused the alleged property damage because he was not allowed in the rooms while the officers conducted their search. Further, the four sued officers denied causing any property damage. Had Colbert faced a motion to dismiss, where district courts take all well-pleaded allegations as true, his theory of the case that the four named officers were responsible for the alleged damage may have been sufficient. At summary judgment, however, Colbert must put forth evidence to support that claim. He did not. Finding no genuine dispute of material fact regarding the named officers' personal responsibility for the alleged misconduct, summary judgment on this claim was proper.

We recognize the potential tension between § 1983's individual-responsibility requirement and factual scenarios of the kind present here: It may be problematic to require plaintiffs to specifically identify which officers caused property damage when officers commonly remove these individuals from

the search area. There can be acceptable reasons for officers to clear a search area (*e.g.*, officer and citizen safety, evidence preservation), but doing so can risk effectively immunizing officers from property-damage claims by preventing a plaintiff from observing the person responsible for the damage. We have indicated, however, that plaintiffs in this context can still satisfy § 1983's personal-responsibility requirement by including in their complaint allegations of misconduct that are unaffected at summary judgment by the inability to observe the search. For example, plaintiffs may allege that the named officers participated in something akin to a "conspiracy of silence among the officers" in which defendants refuse to disclose which of their number has injured the plaintiff. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 974 (7th Cir. 2003); *see also Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992) (affirming summary judgment for defendant officers, despite recognizing the plaintiffs' "bind," in part because the plaintiffs had "allege[d] no conspiracy"). In *Molina*, the plaintiffs alleged that at least one of seventeen officers had damaged their truck. The plaintiffs did not, however, "claim to have actually seen any of the seventeen officers involved in the search damage the truck," as the officers had handcuffed and removed them from the search. *Id*. at 973. In affirming summary judgment for the officers, we noted that "the Molinas ha[d] not alleged a conspiracy of silence among the officers (a move that might have strengthened their argument that *Hessel* is inapplicable), and the evidence linking Officer Cooper, one of *seventeen* officers who could conceivably have damaged the truck, [was] simply too thin to survive summary judgment." *Id*. at 974. As a result, we concluded that "[n]o jury could reasonably infer … that *Officer Cooper* caused the damage to the truck." *Id*. (emphasis added).

Colbert's claim meets the same fate. Colbert, like the plaintiffs in *Molina* and *Hessel*, did not allege anything like a "conspiracy of silence." Nor did he do so in his Second Amended Complaint, which he filed after learning that appellees had denied responsibility. And even if Colbert had alleged something like an illegal agreement among the named officers, he pointed to no evidence to support such misconduct. Without more, no jury could reasonably conclude that these particular defendants had any individual involvement in Colbert's alleged property damage. Thus, this claim does not survive summary judgment.

This is not to suggest that plaintiffs in this context must plead a particular legal theory. *See King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014) ("A complaint need not identify legal theories … .") (citation omitted). Rather, in light of § 1983's individual-responsibility requirement, the plaintiff opposing summary judgment in this context must at a minimum have (1) pled a claim that plausibly forms a causal connection between the official sued and some alleged misconduct, *and* (2) introduced facts that give rise to a genuine dispute regarding that connection. Suing four of ten officers for alleged property damage and then acknowledging the inability to identify those actually responsible for the damage, as Colbert did, does not satisfy that requirement—especially when the sued officials deny having caused that damage. Instead, in the setting of this case, alleging that those four officers colluded, or conspired, to conceal the identities of those responsible for the damage, for example, might well provide an avenue for relief that sufficiently constructs the necessary causal connection between the official and some wrongdoing, regardless of whether the plaintiff was able to observe the search. As noted earlier, Colbert did not make this allegation or present any

supporting evidence, and he cannot, in his opposition to de-
fendants' motion for summary judgment, "amend [his] plead-
ings[,] … introduce new theories of liability[,] … [or] add en-
tirely new factual bas[e]s … not previously presented." *Whit-
aker*, 772 F.3d at 807–08.

Colbert does not address *Molina* or *Hessel*. Rather, he sug-
gests we shift the burden of production and require the offic-
ers to show that they did not cause any property damage. This
argument fails for two reasons. First, we have never adopted
such an approach. In fact, we have concluded that assuming
one of the searching officers must have been responsible for
the alleged misconduct "is not good enough to fend off sum-
mary judgment." *Hessel*, 977 F.2d at 305. This is because
"[p]roximity to a wrongdoer does not authorize punish-
ment." *Id*. "That leaves the pure principle of collective pun-
ishment as the sole basis of liability … . Happily that principle
is not … a part of our law." *Id*.

Second, even if we adopted Colbert's burden-shift ap-
proach, he at least would have needed to have sued all of the
officers he had reason to believe were responsible for the al-
leged property damage.[8] Not requiring this condition, but al-
lowing a burden-shift, would promote random and frivolous
litigation against law-enforcement officials. We have previ-

---

[8] The plaintiffs in *Molina* and *Hessel* may have sued all of the officers ar-
guably responsible for the misconduct alleged in those cases; however, the
plaintiffs did not argue that the burden of production should shift to the
officers, so we did not resolve that issue. *See Hessel*, 977 F.2d at 305
("Whether any such approach (so redolent of collective punishment)
might have been used by the plaintiffs in this case we need not decide:
they have not urged it.").

ously observed that § 1983 claims and accompanying "bur-den-shift" arguments like those we now confront all sound in res ipsa loquitur tort liability. *See Hessel*, 977 F.2d at 305 (citing *Ybarra v. Spangard*, 25 Cal.2d 486 (1944)). To succeed on this theory of liability in Illinois, plaintiffs must join "all parties who could have been the cause of the plaintiff's injuries … as defendants." *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 339–40 (Ill. 1990). Doing so ensures that "liability will surely fall on the actual wrongdoer." *Id.* at 340. Otherwise, "there is a real possibility that the defendant actually responsible for the in-juries is not before the court." *Id*. at 340. While it is possible that "one or more defendants will be found liable and others absolved, … this should not preclude the application of the rule of res ipsa loquitur." *Ybarra*, 25 Cal.2d at 492.

Colbert did not pursue either of the above alternative ave-nues. He sued four officials, but he did not allege that they unlawfully agreed to conceal the identities of those who caused the supposed property damage. And he alleged prop-erty damage, but he did not sue all of the officers who might have been responsible for that damage. Instead, he inexplica-bly sued four of the ten searching officers and argued that they caused the property damage while conceding that he could not know which of the ten officers had caused said damage. By proceeding in this way, Colbert created a risk that the officer actually responsible for the alleged damage was not before the court. Accordingly, in the present context, Col-bert does not satisfy § 1983's individual-responsibility re-quirement and his Fourth Amendment property-damage claim cannot survive summary judgment.

Colbert next relies on *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000), for the proposition that a § 1983 plaintiff can recover if

he can show that an officer ignored a realistic opportunity to intervene while other officers acted illegally. Though this general principle is true, a plaintiff still must make an individual identification of the officers who failed to act, as explained above. In *Miller*, the plaintiff narrowed his excessive-force allegation to two of six arresting officers. *See id.* at 495. Although the plaintiff could not identify which of the two officers had used excessive force, he *did* identify the remaining four officers who stood by and, as a result, ignored a realistic opportunity to intervene. *See id.* This satisfied § 1983's individual-responsibility requirement. Here, Colbert does not specifically identify any officer who was responsible for the alleged damage, or any who turned a blind eye to other officers' allegedly illegal actions.

### C.  False Arrest

Finally, Colbert brought a § 1983 claim against the City of Chicago for falsely arresting him by enforcing an allegedly unconstitutional ordinance. "In order to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom not only caused the constitutional violation, but was 'the moving force' behind it." *Estate of Sims ex rel. Sims v. Cty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). Unless an unconstitutional policy caused the alleged injury, there cannot be municipality liability. *See id.* at 514–15.

Officer Willingham's arrest report initially listed § 8-20-040, which outlawed the possession of more than one operable firearm per household, as the ordinance underlying Colbert's arrest. Colbert originally argued that this ordinance was unconstitutional under *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In response, Officer Willingham filed an

affidavit clarifying that his reference to § 80-20-040 was a scrivener's error: He had intended to list the now-repealed § 8-20-140 as the relevant provision, which, as of March 31, 2011, made it "unlawful for any person to carry or possess a firearm without a firearm registration certificate." Chi. Mun. Code § 8-20-140(a). Despite this explanation, Colbert and Crutcher continued in their second amended complaint to challenge the constitutionality of § 8-20-040, without mentioning § 8-20-140. As Colbert first challenged § 8-20-140 in his response opposing summary judgment, his argument is waived. *See Abuelyaman*, 667 F.3d at 814.

Colbert, relying on cases involving substantive changes in deposition testimony, *see, e.g.*, *Thorn v. Sundstrand Aero. Corp.*, 207 F.3d 383, 389 (7th Cir. 2000), argues that the district court should have allowed the jury to decide which ordinance was actually underlying the charge (*i.e.*, whether listing § 8-20-040 in the criminal charge was an honest mistake or something more serious). Though *Thorn* dealt with substantive changes to sworn deposition testimony, not police documents, we recognized that "the correction of an error in transcription" is permissible. *Id.* Here, Colbert does not point to anything that conflicts with Officer Willingham's affidavit explaining his transcription error. *Id*.

Further, Colbert argues that it was the City's burden to show that § 8-20-140 was constitutional, relying on *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). In *Ezell*, however, we explained that the City has the burden to justify "*challenged* firearms law[s]." *Id*. at 702–03; *see also Ezell v. City of Chi.*, 846 F.3d 888, 892 (7th Cir. 2017) (reiterating the government's burden to justify a "challenged law"). Colbert did not

properly challenge § 8-20-140; so the government had no burden to establish its constitutionality.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part. I agree with my colleagues that we should affirm summary judgment for defendants on the search of Colbert's person and bedroom (Part II-B-1) and the false arrest claim (Part II-C). I respectfully dissent, however, from the decision to affirm summary judgment on Crutcher's malicious prosecution claim (Part II-A) and Colbert's property damage claim (Part II-B-2). Plaintiffs have raised genuine issues of material fact regarding these two claims.

The factual account provided by Crutcher and Colbert may or may not be true, but that question is not before us. On appeal from summary judgment, we must treat their evidence as true and give them the benefit of reasonable inferences from the evidence. *Georgia-Pacific Consumer Prods. LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727 (7th Cir. 2011).

Plaintiffs' evidence tells a disturbing story. Crutcher and Colbert describe a scene where, in the early morning hours of March 31, 2011, officers taunted and terrorized them and their families while destroying their home. Their testimony describes in detail how officers threatened them, cursed them, and struck them. They recount the fright of their children as officers broke holes in the walls, cut open a couch, tore doors off of cabinets, and more. They even describe an officer who unholstered his firearm and threatened to shoot Crutcher's six-week-old puppy before leaving the dog outside, where it was lost.[1]

---

[1] In addition to the property damage discussed by the majority, ante at 3, plaintiffs describe the officers damaging clothing, a weight bench, the basement door, the steps, bedroom dressers, and an electronic tablet.

This case raises larger questions about how courts should address claims of law enforcement misconduct. These questions are particularly pressing for members of our community, like plaintiffs, who are more likely to experience such misconduct. Crutcher and Colbert are black men. It's no secret that people of color are disproportionately subject to police misconduct. See *Utah v. Strieff*, 579 U.S. —,—, 136 S. Ct. 2056, 2070 (Sotomayor, J., dissenting); U.S. Dep't of Justice Civil Rights Division & U.S. Attorney's Office Northern District of Ill., *Investigation of the Chicago Police Department* 145 (Jan. 13, 2017) (finding that Chicago Police Department "has tolerated racially discriminatory conduct that not only undermines police legitimacy, but also contributes to [a] pattern or practice of unreasonable force"). Part I addresses Colbert's claim for property damage based on unreasonable execution of the search. Part II addresses Crutcher's claim for malicious prosecution.

I.  *Colbert's Property Damage Claim*

A.  *Unreasonable Execution of the Search*

This first issue stems from the combination of the regime of individual liability under 42 U.S.C. § 1983 and a reasonable but intrusive police practice to ensure safety during searches of homes: securing residents where they cannot interfere with, but also cannot see, the execution of the search. See *Michigan v. Summers*, 452 U.S. 692 (1981). "Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself

---

Crutcher testified that officers dismantled his stereo and television, damaging them in the process, and that officers destroyed photographs of his grandmother, leaving them "balled up" and covered in dog feces.

is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998); see also *Johnson v. Manitowoc County*, 635 F.3d 331, 335 (7th Cir. 2011); *Green v. Butler*, 420 F.3d 689, 694–95 (7th Cir. 2005); *Lawmaster v. Ward*, 125 F.3d 1341, 1349–50 & n.3 (10th Cir. 1997) (reversing summary judgment in part; searching officers left plaintiff's gun in dog's water bowl and left cigar and cigarette ashes in his bedding).

The problem is, if officers carry out a search in an unreasonable way, causing unnecessary or excessive destruction, how can the residents and ultimately courts hold accountable the individual officers responsible for the misconduct? The majority concludes that Colbert cannot reach a jury with his property damage allegations because he cannot identify who broke what. Colbert is unable to do this because the officers handcuffed him and prevented him from observing the search. Ante at 13. The majority emphasizes that Colbert did not sue every officer at the scene, noting that it is possible none of the named defendants are responsible for the damage. Ante at 15. Things might have been different, the majority says, if Colbert had alleged a "conspiracy of silence" in his complaint. While I am pleased that the majority offers a solution for the problem, its solution sets too high a bar for plaintiffs in Colbert's situation.

First, this is not a pleading deficiency. A plaintiff is not required to plead legal theories in his complaint. *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal error."), quoting *Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). This rule makes sense, particularly in a case like this. When Colbert filed his original complaint, he

did not know the officers would deny any recollection of breaking his property. At that time there was no "conspiracy of silence" to allege. The majority notes that Colbert did not allege a conspiracy of silence in his second amended complaint, which he filed after learning that the officers denied responsibility. Ante at 15. That's true but it shouldn't matter. A plaintiff is not required to plead legal theories in his second amended complaint either. (In any event, if we are going to insist that these matters be in the pleadings, then district courts will need to be liberal in allowing amendments along these lines. See Fed. R. Civ. P. 1 & 15(a)(2).)

During their depositions, the officers claimed they did not remember many of the events from March 31, 2011. Since those depositions, Colbert has argued quite clearly in the district court, Dkt. No. 75 at 14–15, and in this court that the officers are conspiring to deny their wrongdoing. Colbert's brief here argues: "For example, defendants Tweedle and Johnson will, if they testify in accordance with their deposition testimony, admit to having been present but will deny any recollection of the search of Colbert's residence. … At trial, plaintiffs expect each defendant to deny wrongdoing; the jury should be permitted to assess the credibility of these claims." It is unclear what else Colbert should have said to assert a "conspiracy of silence."[2]

---

[2] In *Molina v. Cooper*, 325 F.3d 963, 974 (7th Cir. 2003), and *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992), we used the verb "allege" in discussing the possibility that a conspiracy of silence could shift the burden of production. Appellate opinions would be clearer if courts always took care to distinguish between what parties "allege" (in pleading), "testify" (in evidence), and "argue" or "contend" (in briefs and oral argument). Unfortunately, courts do not always keep those verbs separate. Nothing in *Molina* or *Hessel* indicates that the panels were suggesting a

Second, by dismissing Colbert's claim because he did not sue *enough* officers, see ante at 16–17, the majority invites future plaintiffs to sue every officer on the scene and to sort out later the issues of individual liability. This will needlessly drag law enforcement officers into litigation where they had little or no involvement in the underlying conduct. Suppose Colbert had sued all ten officers and all ten denied participating in the specific acts of property destruction. Those denials, combined with evidence that the damage occurred and was inflicted in the course of the search, would be circumstantial evidence permitting a reasonable inference that there was a conspiracy of silence among the officers. In light of this decision, plaintiffs in similar cases will be well-advised to pursue that approach.

There is at least one better approach in cases like this— cases where a plaintiff offers evidence that officers acted unreasonably in the search and took steps to prevent the plaintiff from identifying who caused the damage. It would be to shift the burden of production to the defendants on the issue of individual responsibility. The majority refers to this approach, ante at 16, and other circuits have used this method to varying degrees. When faced with a similar situation where officers masked their identities, the Sixth Circuit permitted the district court to shift the burden of production on remand: "Although an officer's mere presence at the scene of a search is insufficient to establish individual liability under § 1983, here the agents' intent to conceal contributed to plaintiffs' impaired ability to identify them." *Burley v. Gagacki*, 729 F.3d 610, 622 (6th Cir. 2013) (citations omitted); see also *Burley v. Gagacki*,

new pleading requirement, which in any event would be difficult to justify in light of more general pleading standards.

834 F.3d 606, 615 (6th Cir. 2016) (later appeal clarifying that even if burden of production is shifted to defendant, plaintiff still has burden of persuasion).

The Ninth Circuit likewise has used burden-shifting in certain instances where plaintiffs cannot learn the identity of the officers involved. See, e.g., *Dubner v. City and County of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) ("Although the plaintiff bears the burden of proof on the issue of unlawful arrest, she can make a prima facie case simply by showing that the arrest was conducted without a valid warrant. At that point, the burden shifts to the defendant to provide some evidence that the arresting officers had probable cause for a warrantless arrest. The plaintiff still has the ultimate burden of proof, but the burden of production falls on the defendant."); *Johnson v. BART*, 724 F.3d 1159, 1173 (9th Cir. 2013) (holding that burden-shifting approach applies only where officers are required to show probable cause).

Here, Colbert offers evidence that the officers carried out their search in an unreasonable way, causing a great deal of unnecessary damage. He cannot identify which officers broke which items because he was restrained. I am not criticizing the police practice of preventing residents from interfering with an otherwise lawful search. That will often make sense for everyone's safety. But where the police, for these presumably legitimate reasons, made it impossible for the residents to know which individual officers carried out which actions, the burden of production should shift to these four defendants. If a defendant seeks summary judgment, he must present evidence that he is not personally liable for the unreasonable search, either by identifying who caused the damage or

through some other means. Otherwise, the matter should proceed to trial so a jury can evaluate credibility. At trial, Colbert would still have the ultimate burden of persuasion.

This burden-shifting approach would retain the regime of individual responsibility under § 1983 without resorting to what the majority calls "collective punishment." See ante at 16. This approach is only a procedural adjustment, shifting the burden of production based on the defendants' own actions when they act together. The burden of persuasion would still remain with the plaintiff.

I would welcome better solutions to this problem, but a solution is needed. This burden-shifting approach would fit with the requirement of personal responsibility without interfering with officers' ability to restrain occupants so they can conduct safe and effective searches. It would also prevent the unjust effect of allowing officers to sequester residents and then destroy a home with impunity.

B.  *Failure to Intervene*

Colbert also provided sufficient evidence to support liability for each of the four defendants for an unreasonable search on a theory of failure to intervene. It is well established that an officer may be liable if she witnesses another officer violating a civilian's constitutional rights, has a reasonable opportunity to intervene, and fails to do so. See, e.g., *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000) ("An official satisfies the personal responsibility requirement of § 1983 if she acts *or fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights."), citing *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (emphasis in original).

*Miller* is instructive. A motorist sued under § 1983 for excessive use of force, among other claims. He alleged that state police officers beat him while he was handcuffed, face down on the ground. As we explained, the district court granted summary judgment for the defendants "because Miller could neither identify the officer who allegedly attacked him, or otherwise support his claim with sufficient facts." *Id.* at 493. We reversed. We noted that if one of the officers was beating Miller, "whichever officer was not directly responsible for the beating was idly standing by." *Id.* at 495. We concluded: "If Miller can show at trial that an officer attacked him while another officer ignored a realistic opportunity to intervene, he can recover." *Id.* We should take the same approach to Colbert's claim for an unreasonable search.

Colbert claims that, at minimum, the four officers failed to intervene when their fellow officers searched his home in an unreasonable manner. The majority notes that Colbert did not observe the officers failing to intervene. Ante at 18. But we did not require such evidence in *Miller*. Even though Miller did not observe the officers failing to intervene during his beating (he was face down), it was sufficient that the other officers were "nearby." *Miller*, 220 F.3d at 495. The same is true here.

The majority claims that Colbert has failed to "identify any officer … who turned a blind eye to other officers' allegedly illegal actions." Ante at 18. But Colbert has identified four individual officers and provided evidence of their failure to act. As the officers themselves testified, Colbert's home was "a very small residence" with only a few rooms. According to testimony, the officers' search was incredibly loud and disruptive, as one might expect when doors are torn from their hinges. The four defendants were necessarily close to any

other officers in the home, and they failed to intervene. We required no more in *Miller*. We should require no more here. Defendants may argue, of course, that they did not notice their colleagues in the next room putting holes in the walls. The plausibility of that argument should be a jury issue.

## II. *Crutcher's Malicious Prosecution Claim*

Plaintiff Crutcher sued under state law for malicious prosecution. Crutcher testified that Officer Willingham falsely reported that he had confessed to knowing there was a shotgun in the closet of Colbert's locked bedroom. According to Crutcher, Officer Willingham lied in the arrest report because Crutcher was unable to provide inside information about a gang. Crutcher described a series of exchanges where Willingham asked for gang intelligence, grew angry when Crutcher was unable to give any tips, and then threatened "if you don't give me the information I want, [you're] going down for the rest of your life." This evidence supports an inference of malice, in my view, and the majority does not disagree. The majority rejects Crutcher's claim, however, on the theory that even if Officer Willingham did lie, the grand jury indictment broke the chain of causation between his lie and Crutcher's prosecution. Ante at 9. I disagree, at least for purposes of summary judgment.

### A. *Grand Jury Indictment and Chain of Causation*

First, the "broken chain of causation" cases show that an officer who wrongly *arrests* is not necessarily liable for the later decision to maliciously *prosecute*. I agree. The bad actor in a false arrest is not necessarily the same as in a malicious prosecution. See *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th

Cir. 1996) ("[T]he State's Attorney, not the police, prosecutes a criminal action.").

In this case, however, the claim is based not on a wrongful arrest but on Willingham's alleged lie after the arrest in the arrest report. Crutcher's claim is that after the officers arrested him, Willingham took malicious steps to ensure his prosecution. This claim fits squarely within the rule the majority cites from *Reed*: "the chain of causation is broken by an indictment, *absent an allegation of pressure or influence exerted by the police officers*, or knowing misstatements by the officers to the prosecutor." Ante at 8, citing *Reed*, 77 F.3d at 1053 (emphasis altered). There is evidence that Willingham acted to influence the prosecution by lying in the report after Crutcher's arrest.

Second, as a practical matter, the majority never confronts the implausibility of its assumption. According to the majority, the prosecutor never told the grand jury about Crutcher's alleged admission in the arrest report. That is, the prosecutor seeking the indictment for knowing possession of a firearm that was found in someone else's locked bedroom never presented the grand jury with information that Crutcher had confessed he knew the gun was in the home. On this record, Officer Willingham's arrest report was the prosecutor's *only* evidence that Crutcher knew about the gun in Colbert's bedroom closet. I find it difficult to believe that a competent prosecutor would fail to present this evidence to a grand jury. At the very least, we should not make such an improbable assumption in favor of the defense in reviewing summary judgment for the defense.

B.  *Absence of Probable Cause*

Since the majority disposes of Crutcher's claim based on the grand jury indictment, it does not reach the defendants' argument that there was probable cause to prosecute Crutcher for knowing possession of the shotgun. This argument also should fail. Crutcher's evidence would let a jury find that he was prosecuted without probable cause.

The charges against Crutcher required proof that he *knew* a firearm was in the home. He claims he did not know about the gun in the closet of Colbert's locked bedroom. Officer Willingham claims that Crutcher confessed to knowing. Crutcher testified he did not confess as much. This conflicting evidence presents a genuine issue of material fact.

Defendants also argue that, even without Officer Willingham's alleged lie, there was probable cause that Crutcher knew about the gun. They argue that a tipster told Willingham that he saw Crutcher holding the two guns in the home. This tip was then corroborated, defendants claim, when the officers found one specific gun (the shotgun) and the holster for the other gun that the tipster had mentioned.

The majority seems to take the tip as undisputed fact, but the tip should not defeat summary judgment for three reasons. First, as the district court noted, there are significant problems with Willingham's testimony on the tipster. "Officer Willingham failed to provide any details about the purported reliability of the informant, despite fervent questioning by Plaintiff's counsel." The district court thus decided to treat the cooperating individual as an anonymous tipster, and to give the statements less weight.

Second, there is a credibility issue as to which came first, the search or the supposed tip. We have no record of the tip before the search. *Even Willingham's arrest report did not mention it.* The first mention apparently came in Willingham's deposition. Thus, based on the record before us, Willingham never claimed there was a tip about seeing Crutcher with the guns until after he was sued.

Third, as if those problems were not enough, Crutcher's testimony conflicts with Willingham's account of the tip about guns. According to Crutcher, when the officers first arrived they were searching not for guns but for drugs. Crutcher testified that when Willingham entered the home, he used slang for drugs to ask first: "Where's the diesel?" Willingham said he had received a tip "that y'all had some drugs," and he accused Crutcher of flushing them down the toilet. As the officers went through the house, they further indicated that they were looking for drugs, for instance by searching through the sugar in the kitchen. According to Crutcher, the officers did not mention guns until the end of the search.

Viewing the evidence through a summary judgment lens favorable to plaintiffs, then, the police and prosecution had no evidence that Crutcher knew about the shotgun and holster found upstairs in Colbert's locked bedroom. Crutcher should be able to present his claim for malicious prosecution to a jury.