**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2594
_____

EMIL JUTROWSKI,
                                Appellant

v.

TOWNSHIP OF RIVERDALE; STATE OF NEW JERSEY,
by and through the New Jersey State Police; JEFFREY
HEIMBACH, New Jersey State Police Trooper, individually
and in his representative capacity as a State Police Officer;
JAMES FRANCHINO, individually and in his representative
capacity as a new Jersey State Police Officer; TRAVIS
ROEMMELE, individually and in his representative capacity
as a Riverdale Police Officer; CHRISTOPHER BIRO,
individually and in his representative capacity as a Riverdale
Police Officer; JOHN DOES (1-20); COL. RICK FUENTES,
in his representative capacity as a commanding and Chief
Executive Officer of the New Jersey State Police; CHIEF
THOMAS SOULES, in his representative capacity as Chief
of the Riverdale Police Department,
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Civil Action No. 2:13-cv-07351)
Honorable John M. Vazquez, U.S. District Judge

_____

Argued: March 12, 2018

Before: JORDAN, KRAUSE, and
GREENBERG, *Circuit Judges*

(Opinion Filed: September 12, 2018)

Robert J. Degroot, Esq.     [Argued]
56 Park Place
Newark, NJ 07102

*Counsel for Plaintiff-Appellant Emil Jutrowski*

Anthony P. Seijas, Esq.     [Argued]
Cleary Giacobbe Alfieri & Jacobs
169 Ramapo Valley Road
Upper Level 105
Oakland, NJ 07436

*Counsel for Defendant-Appellees Township of
Riverdale, Travis Roemmele, Christopher Biro,
and Chief Thomas Soules*

Gurbir S. Grewal, Attorney General of New Jersey
Matthew J. Lynch, Esq.     [Argued]
Robert P. Preuss, Esq.
Office of the Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625

> *Counsel for Defendant-Appellees State of New Jersey, Jeffrey Heimbach, James Franchino, and Col. Rick Fuentes*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

This case arises from an undisputed constitutional violation: an act of excessive force committed during the arrest of Appellant Emil Jutrowski in which he was kicked in the face, breaking his eye socket. Appellees—consisting of two Riverdale, New Jersey Police Officers and two New Jersey State Troopers involved in the arrest (the "Individual Defendants"), and their respective employers, the Township of Riverdale and the State of New Jersey (collectively, the "Defendants")—do not dispute that one of the officers kicked Jutrowski. But each of the Individual Defendants asserts he neither inflicted the blow himself nor saw anyone else do so, and Jutrowski, whose face was pinned to the pavement when the excessive force occurred, is unable to identify his assailant. He therefore brought excessive force claims against all Defendants and conspiracy claims against the four Individual Defendants under 42 U.S.C. § 1983. The District Court, however, relying on our precedent that a defendant in a civil rights action must have "personal involvement" in the alleged wrongs, *Rode v. Dellarciprete*, 845 F.2d 1195, 1207–08 (3d Cir. 1988), determined that Jutrowski's inability to identify his attacker was fatal to his claims and granted summary judgment in Defendants' favor.

We are now called upon to outline the contours of this "personal involvement" requirement in § 1983 cases and to consider its application when a plaintiff who indisputably

4

suffered a constitutional injury at the hands of one officer comes up against to the proverbial "blue wall of silence." Despite the unfortunate situation created for plaintiffs like Jutrowski who are unable to identify their attackers through no fault of their own, we hold that a plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the "personal involvement" of each named defendant to survive summary judgment and take that defendant to trial. Nonetheless, where a plaintiff adduces sufficient evidence of an after-the-fact conspiracy to cover up misconduct, even of an unidentified officer, he may be able to state a claim under § 1983 for the violation of a different constitutional right: the due process right of access to the courts. Such is the case here. Accordingly, we will affirm the District Court as to Jutrowski's excessive force claim but will reverse and remand as to his conspiracy claim.

## I.   Background

### A.   Factual Background[1]

On June 23, 2010, Emil Jutrowski, after drinking several vodka sodas at a bar in East Hanover, NJ, crashed his sport utility vehicle along the shoulder of the highway. Other than a small cut above his right eye, Jutrowski suffered no injuries from the accident. Because his car was pinned up

---

[1] The factual summary below draws from record evidence and because the District Court granted summary judgment in the defendants' favor, we view the facts in the light most favorable to Jutrowski. *See, e.g.*, *Pellegrino v. U.S. Transp. Sec. Admin*, No. 15-3047, 2018 WL 3371699, at *2 n.2 (3d Cir. 2018).

5

against the left guardrail, however, he could not exit from the driver's side door and was still attempting to "pull away" when police arrived. App. 285. The first two officers to arrive on the scene were Officer Travis Roemmele and Officer Christopher Biro of the Riverdale, New Jersey Police Department (the "Riverdale Defendants"). Moments later, three State Troopers arrived, including Appellees Jeffrey Heimbach and James Franchino (the "State Trooper Defendants").

The officers quickly deduced that Jutrowski was heavily intoxicated. Heimbach, who first approached Jutrowski, immediately detected "an overwhelming odor of an alcoholic beverage emanating from the interior of [the] vehicle," and asked Jutrowski to produce his license and registration. App. 285. Instead, Jutrowski attempted to light a cigarette and proceeded to rub liquid hand sanitizer on his face.[2] As the smell of alcohol became "stronger," Heimbach determined that "it was emanating directly from [Jutrowski's] breath." App. 285. He also observed that Jutrowski's eyes were bloodshot and his pupils extremely dilated, and that, although Jutrowski was still seated in his vehicle, he was disoriented and moving slowly. *Id*.[3]

---

[2] According to the officers, Jutrowski took "liquid hand sanitizer and rubbed it all over his face and head and attempted to swallow s[o]me." App. 285. Jutrowski testified that he was merely trying to apply hand sanitizer to the gash over his eye.

[3] Under the circumstances, Heimbach normally would have performed a field sobriety test, but he declined to do so on account of Jutrowski's injuries.

6

It was also apparent that Jutrowski needed medical attention. Heimbach noticed the cut above his right eye, and Jutrowski told Heimbach that he was injured, that he had a heart condition, and that he wanted to go to the hospital. Soon after, emergency medical personnel arrived and administered first aid while Jutrowski remained seated in his SUV. At the point Jutrowski verbally refused further medical treatment but also refused to sign a written waiver of further treatment, Heimbach asked Jutrowski to exit his vehicle. Jutrowski initially refused but eventually, because the driver's side door was inoperable, he climbed over the seat and exited the passenger door without assistance. The officers acquiesced to Jutrowski's request not to be handcuffed on account of his heart condition, and Troopers Heimbach and Franchino began escorting him towards the ambulance on the other side of the highway. Jutrowski, however, was unsteady on his feet and wobbled, so Trooper Franchino, concerned about "the roadway conditions and the proximity to traffic," reached out for Jutrowski's right wrist to steady him.[4] App. 281. In reaction, Jutrowski "pulled his hand away in an upward fashion, subsequently striking [Franchino] in the forehead with his forearm," App. 281, and Franchino, in turn, promptly executed a "front leg sweep" maneuver that took Jutrowski to the ground, App. 281, 424. Jutrowski fell "straight ahead," App. 425, with "some force," App. 426, and "just kind of face-planted, just like a tower falling over," App. 336.

---

[4] Jutrowski testified he was unsteady because he was struck in the crotch by the stick shift when he climbed out of the car and was therefore in severe pain, but Trooper Franchino testified that Jutrowski was "stumbling and kind of staggering . . . walking closer to the lane of traffic." App. 435.

Lying on the ground on his stomach, Jutrowski's face was turned to his right, with his left cheek on the pavement. With Troopers Franchino and Heimbach on Jutrowski's right side and a third trooper on his left, the officers attempted to handcuff him—a difficult task because Jutrowski's hands were tucked underneath him and he was a "very strong, very big man," allegedly weighing over 300 pounds at the time. App. 375, 427, 462. As Franchino used his baton to pry Jutrowski's arms from underneath him, Riverdale Officers Biro and Roemmele ran over to assist. Biro knelt down at Jutrowski's feet to hold his legs, and Roemmele "assisted by holding [Jutrowski's] legs while the officers were finally able to remove [his] hands from under his body." App. 288. Heimbach put his knee in the small of Jutrowski's back to subdue him and with Jutrowski still lying face down, Heimbach began to search him. Franchino was positioned near Jutrowski's shoulders, and was thus "closest to his head." App. 438.

At some point in the midst of this scuffle, one of the officers kicked Jutrowski hard on the right side of his face,[5]

---

[5] On appeal, the State Trooper Defendants concede that Jutrowski was kicked, *see* State Trooper Br. 5. While the Riverdale Defendants do not make this concession as explicitly, they "d[id] not contest that Plaintiff was kicked" before the District Court, App. 24, nor do they on appeal, *see* Riverdale Br. 12.

hard enough to inflict a "blow out fracture," that is, a broken nose and broken eye socket, requiring surgery. App. 262–63.[6]

After the kick, the officers turned Jutrowski over on his back and Trooper Heimbach continued searching him. As Heimbach was patting him down, however, Jutrowski "kick[ed] his left leg up striking . . . Trooper [Heimbach] in the face with his left foot." App. 288. At that point, Jutrowski was handcuffed and taken to the hospital. He ultimately pleaded guilty to driving under the influence.

## B. Procedural History

Because he was unable to identify which of the officers in his immediate vicinity was the one that kicked him, Jutrowski filed suit against Officers Biro and Roemmele and Troopers Franchino and Heimbach, along with the Township of Riverdale and State of New Jersey (collectively, the "Defendants").[7] His complaint, as relevant here, included in

---

[6] A medical expert report indicates that it is unlikely Jutrowski's injury was the "result merely from a fall face first," but instead that it "would take either a kick or punch of significant force to create the type" of injuries he suffered. App. 262–62. To this day, Jutrowski's injury causes him pain, and he suffers from "frequent headaches, vertigo, dizziness, vision problems, sinusitis, difficult concentrating, [and] discharge from his nose . . . ." Appellant's Br. 7.

[7] The operative complaint here was originally filed in state court and was removed by Defendants to the District Court. *Emil Jutrowski v. Township of Riverdale, et al.*, No. 13-7351, 2017 WL 1395484, at *3 (D.N.J. Apr. 17, 2017).

9

Count I a claim for the use of excessive force, in violation of the Fourth Amendment and 42 U.S.C. § 1983, and, in Counts V and VI, claims of conspiracy, in violation of § 1983 and New Jersey law, respectively, to violate federal and state civil rights by using excessive force, by filing false and misleading police reports, and by giving misleading grand jury testimony.[8]

After Defendants unsuccessfully moved for dismissal, the case proceeded to discovery, where it was established that Biro, Roemmele, Franchino, and Heimbach were each in Jutrowski's immediate presence when he was kicked. But Jutrowski was not able in the course of the discovery to identify which of these law enforcement officers inflicted the blow, and none of the officers admitted to being either the perpetrator or a witness. Even Heimbach—who testified that he had his knee in Jutrowski's back between his shoulder blades, that his "sole

---

[8] All told, Jutrowski's complaint included seven counts: (I) a § 1983 claim for excessive force (against the Individual Defendants); (II) a § 1983 claim for failure to properly train, supervise and control officers (against the police departments); (III) a state law tort claim for excessive force, assault and battery (against all Defendants); (IV) a state law tort claim for failure to properly train, supervise and control officers (against the police departments); (V) an alleged conspiracy to violate federal civil rights (against the Individual Defendants); (VI) an alleged conspiracy to violate state civil rights (against the Individual Defendants); and (VII) a claim for assault and battery (against the Individual Defendants). Counts II, III, IV, and VII are not at issue as Jutrowski does not challenge the District Court's entry of summary judgment on those counts on appeal. *Jutrowski*, 2017 WL 1395474, at *6–7.

focus" for "the entire time" was on Jutrowski's head, and that "if anything . . . struck [Jutrowski] in the face, he would know"—allegedly saw nothing. App. 344. Likewise, Trooper Franchino testified that he was the officer "closest to [Jutrowski's] head" and was "more than six inches [but] less than three feet" away when Jutrowski was taken to the ground, but he too saw nothing. App. 438.

Nor did any of the dashboard cameras ("dashcams") on the officers' vehicles capture the incident. Officer Biro's car was parked closest to Jutrowski's, and his dashcam presumably would have had the best view of Jutrowski being escorted from his car across the highway—except that it allegedly did not record. According to Biro's testimony, he did not manually switch on the camera because he believed he was pulling over to investigate a traffic accident, not to effectuate a vehicle stop. *Emil Jutrowski v. Township of Riverdale, et al.*, No. 13-7351, 2017 WL 1395484, at *1 (D.N.J. Apr. 17, 2017). Biro also indicated that the camera should record automatically when the emergency lights are activated, as they were here, but his testimony was ambiguous as to whether that was true at the time of the incident or was a more recent development, and Jutrowski's counsel did not seek clarification. For their part, the State Troopers' dashcams were activated but "did not capture any of the critical alleged events" due to their poor vantage points. *Id.*

In the absence of evidence identifying the perpetrator, the District Court granted summary judgment on all counts for all Defendants. *Id.* As for the use of excessive force, although the Defendants "d[id] not contest that Plaintiff was kicked," the District Court reasoned that because Jutrowski could not "identify which Defendant kicked him," he was essentially

11

asking "the Court to guess which individual Officer Defendant committed the alleged wrong." *Id.* at \*4. In its thorough and thoughtful opinions granting summary judgment and denying reconsideration, the District Court relied on this Court's precedents to conclude that absent an "evidentiary basis on which to hold" any individual defendant liable, Defendants were all entitled to judgment as a matter of law. *Id.* The District Court also rejected Jutrowski's request to fill the evidentiary void with an adverse spoliation inference from the failure to produce Officer Biro's dashcam video because Jutrowski had not made "a request for inspection pursuant to Federal Rule of Civil Procedure 34(a)" or taken other steps to obtain evidence of the video, and thus he failed "to provide sufficient evidence demonstrating that the video actually existed." *Id.* at \*5.

As for the federal and state civil conspiracy counts, the District Court found "no facts suggesting that [Individual] Defendants spoke to each other concerning the alleged kick before the incident occurred" and that it could not infer any "after-the-fact" conspiracy because Jutrowski had not identified specific facts to support the contention "that the officers from Riverdale and the State Police colluded before writing their reports or testifying before the grand jury." *Id*. at \*8. It therefore granted summary judgment on these counts, both to the extent they asserted a conspiracy to use excessive force and to the extent they asserted a conspiracy to violate Jutrowski's rights afterwards.

Jutrowski now appeals, arguing that the District Court erred in granting summary judgment on his claims of excessive force and civil conspiracy.

12

## II. Jurisdiction and Standard of Review[9]

We review the District Court's grant of summary judgment de novo. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015). To warrant summary judgment, the moving party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and all facts should be viewed "in the light most favorable to the non-moving party," with "all reasonable inferences [drawn] in that party's favor," *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). For its part, "[t]he non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings" but, instead, "must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." *D.E. v. Central Dauphin School Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014) (citations omitted).

A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), but "[c]onversely, where a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law."

---

[9] The District Court had jurisdiction under 28 U.S.C. § 1331; we have jurisdiction under 28 U.S.C. § 1291.

13

*Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (citations omitted).

We review the denial of an adverse spoliation inference for abuse of discretion. *In re Hechinger Inv. Co. of Del.*, 489 F. 3d 568, 574 (3d Cir. 2007). A district court abuses its discretion if its decision not to draw the inference rests upon "a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Meditz v. City of Newark*, 658 F.3d 364, 367 n.1 (3d Cir. 2011) (citations omitted).

## III.  Discussion

On appeal, Jutrowski argues that the District Court erred by granting summary judgment on his excessive force claim against all Defendants because he set forth specific facts showing a genuine issue for trial in two ways: by establishing that excessive force was used and that the Individual Defendants were all in close proximity, and by adducing sufficient evidence (the absence of a dashcam video from Officer Biro) to warrant an adverse inference against the Defendants. He also claims error in the grant of summary judgment on his claims against the Individual Defendants for conspiracy to violate his federal and state civil rights. We address these arguments in turn.

### A.  The Excessive Force Claim

As Jutrowski would have it, so long as a plaintiff can show that some officer used excessive force, he may haul before a jury all officers who were "in the immediate vicinity of where excessive force occurred" without any proof of their personal involvement. Appellant's Br. 13. That is simply not

14

the law. Instead, the tenet that a defendant's § 1983 liability must be predicated on his direct and personal involvement in the alleged violation has deep historical roots in tort law principles, is manifest in our excessive force jurisprudence, and is reinforced by persuasive authority from our Sister Circuits.

We begin with principles of tort liability, which necessarily inform our interpretation of § 1983 as a statute "sounding in tort." *Howell v. Cataldi*, 464 F.2d 272, 278 n.10 (3d Cir. 1972); *see Carey v. Piphus*, 435 U.S. 247, 253 (1978) (describing § 1983 as a "species of tort liability"). As the Supreme Court has long recognized, a fundamental principle is that a tortfeasor's "liability . . . will only result from his own neglect . . . ." *Dunlop v. Munroe*, 11 U.S. 242, 269 (1812). That is because "[o]ur system of private liability for the consequences of a man's own acts . . . started from the notion of actual intent and actual personal culpability." Oliver Wendell Holmes, Jr., The Common Law 4 (Boston, Little, Brown, & Co. 1881). And, as a result, "[a]n essential element of [a] plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." W. Page Keeton et al., *Prosser and Keeton on Torts* 263 (5th ed., 1984); *see also* Restatement (Second) of Torts § 430 (1965).

In the § 1983 context, these principles have led the Supreme Court to require a "showing of direct responsibility" by the named defendant and to eschew any "theory of liability" in which defendants played "no affirmative part in depriving any[one] . . . of any constitutional rights," *Rizzo v. Goode*, 423 U.S. 362, 376–77 (1976)—including theories of vicarious or

15

respondeat superior liability, *see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Merklin v. United States*, 788 F.2d 172, 175 (3d Cir. 1986). Instead, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). "Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct." *Id.* at 677 (emphasis added). And, *a fortiori*, if entities and supervisors may not be vicariously liable under § 1983 for the constitutional violation of a given individual, neither may that individual's cohorts who happen to be in the immediate vicinity. *See Anela v. City of Wildwood*, 790 F.2d 1063, 1067–68 (3d Cir. 1986) (observing that defendants may "not be held liable under section 1983 merely because they were members of a group of which some other members were guilty of abuses" (citing *Rizzo*, 423 U.S. at 370–71)).

We have imported these precepts into the excessive force context in a trilogy of cases that squarely foreclose Jutrowski's argument today. In *Howell*, 464 F.2d 272, where the plaintiff alleged that a single police officer exerted excessive force in arresting him and sued two of the six officers at the scene, alleging that one was the perpetrator, we affirmed a directed verdict for the defendants because "[i]nsofar as the two defendants are concerned, one of them is free of liability." *Id.* at 283. "At best," we explained, "there was proof of wrongful conduct of *one*, identified only as one of two possible actors, without an explicit identification as to which of the two," and thus, "without more," there was no way to know which of them should be held to answer for the violation. *Id.* at 283.

In *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997), where the plaintiff alleged that an officer who handcuffed him had dislocated his shoulder but could not identify which, out of the 20 officers on the scene, was the perpetrator, we likewise concluded that there was "no evidentiary basis on which to hold the[] defendants liable" and affirmed the order of summary judgment in their favor on that basis. *Id*. at 821.

In contrast, in *Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002), we reversed the grant of summary judgment on an Eighth Amendment claim where, although the plaintiff-inmate conceded he could not see all five of the defendant-correctional officers during his alleged beating, he testified that "*all of them* . . . were pushing my head, right, into the cabinets . . . and walls," and "the full force of *all the guards* [was] behind me . . . . I said *all of them*." *Id.* at 650 (emphasis omitted). In that circumstance, we explained, the "fact that Smith . . . acknowledged that he could not see those defendants during the beating neither negate[d] their involvement nor their liability as a matter of law."[10] *Id.* Thus, *Smith* ultimately involved nothing more than a dispute about "[t]he *extent* of each officer's participation," which "is . . . a classic factual

---

[10] Jutrowski focuses on other language in *Smith*—specifically, our observation that "it is undisputed that all of the named officers were in the vicinity at some point when Smith alleges he was beaten," *id.* at 651—to argue that mere presence creates "a sufficient issue of material fact to deny . . . summary judgment," Appellant's Br. 18, but in context, this merely indicated there was objective corroboration for the plaintiff's testimony that "all of them" were involved, *Smith*, 293 F.3d at 650.

17

dispute to be resolved by the fact finder," *id*. (emphasis added), while *Howell* and *Sharrar* involved a dispute about the *possibility* of each officer's participation, which we held is insufficient, "without more," *Howell*, 464 F.2d at 282; *see Sharrar*, 128 F.3d at 821, to reach a jury and entitles defendants to judgment as a matter of law.

The line we drew in these cases is consistent with the approach of other Courts of Appeals. Indeed, just last year, our colleagues on the Seventh Circuit wrestled with the "potential tension" between the individual-responsibility requirement of § 1983 and "factual scenarios . . . [where] [i]t may be problematic to require plaintiffs to specifically identify which officers" committed the constitutional violation. *Colbert v. City of Chicago*, 851 F.3d 649, 657–58 (7th Cir. 2017), *cert. denied sub nom. Colbert v. City of Chicago, Ill.*, 138 S. Ct. 657 (2018). In that case, the plaintiff sued four of the ten officers who searched his bedroom, causing property damage, though he "admitted that he was unable to identify which of the ten searching officers had caused the alleged property damage because he was not allowed in the rooms while the officers conducted their search." *Id.* at 657. Despite the "acceptable reasons" for the officers to clear the search area which risked "effectively immunizing officers from property-damage claims by preventing a plaintiff from observing the person responsible for the damage," the court held that the plaintiff was "unable to satisfy § 1983's personal-responsibility requirement at summary judgment." *Id.* at 657–68. At the same time, it observed that plaintiffs in this situation might have recourse "by including in their complaint allegations of misconduct that are unaffected at summary judgment by the inability to observe the search," such as "a 'conspiracy of silence among the officers' in which defendants refuse to

disclose which of their number has injured the plaintiff." *Id.* (citations omitted).

Other Courts of Appeals likewise have held that personal involvement of each defendant is a prerequisite to liability in § 1983 cases. *See, e.g.*, *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) ("To establish liability against an individual defendant acting under color of state law, a plaintiff must show that the defendant was 'personally involved' in the use of excessive force."); *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) ("[I]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.") (citations omitted); *see also Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002) ("[A] plaintiff could not hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct.").

The authorities on which we rely—tort law principles informing § 1983 liability, our own precedent, and the wisdom of our Sister Circuits—are thus unanimous that, in the face of motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial. But Jutrowski has not done so: As he concedes, after significant discovery, he has narrowed the potential universe of actors to those that were in his immediate vicinity, but he filed suit against only four of the five of them and still cannot "identify the actor that kicked him." Appellant's Br. 12. Put another way, he admittedly seeks to proceed to trial against at least three defendants who are "free of liability," *Howell*, 464 F.2d at 283, without any "ascertainment of [which] individual charged was the perpetrator of the constitutional deprivation,"

*id.* at 282. As the foregoing discussion teaches, that is not a sufficient basis to survive summary judgment.

Nor is that deficiency remedied by the potential adverse inference Jutrowski contends should be drawn from Officer Biro's failure to produce his dashcam video. At summary judgment, "the trier of fact generally may receive the fact of . . . nonproduction or destruction [of relevant materials] as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him," *see Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995). But a spoliation inference requires, among other things, "actual suppression or withholding of evidence," *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012), and here, the District Court found, it would have to "assume[] there was a recording of the incident" because Jutrowski "fail[ed] to provide sufficient evidence demonstrating that the video actually existed." *Jutrowski*, 2017 WL 1395474, at *5.

That evidence is indeed starkly absent. On appeal, as at summary judgment, Jutrowski posits the existence of an automatic recording based entirely on Biro's statement at his deposition that the recording device "activates with [the emergency] lights." App. 396. This statement, however, was in the present tense, while moments later, Biro made cryptic reference to events "back then" and a "different system." *Id*. Yet Jutrowski neither asked follow-up questions at that point,[11]

_____

[11] Jutrowski's counsel did not seek to clarify, for example, whether Biro's dashcam was programmed at the time of the incident to automatically record upon activation of emergency lights or that was only a more recent development;

20

nor sought afterwards to confirm the existence of the video through "a request for inspection pursuant to Federal Rule of Civil Procedure 34(a)" or other discovery devices. *Jutrowski*, 2017 WL 1395474, at *5. Having failed to establish the existence of the video, Jutrowski necessarily failed to show it was "actual[ly] suppress[ed]." *Bull*, 665 F.3d at 73. Thus, whatever inferences a reasonable jury might draw from the absence of this dashcam footage at trial, *see infra* Section III.B, the District Court's refusal to draw an adverse inference at summary judgment was not an abuse of discretion.

The upshot is a record insufficient for any reasonable jury to identify which, if any,[12] of the Individual Defendants

---

whether there were circumstances in which the dashcam would not automatically record with the lights activated; whether it recorded with the lights activated at other stops that day; or whether he had filed any report concerning a malfunction. Nor does the record on appeal reflect any interrogatories or requests for admission to this effect. Moreover, we have held that "[n]o unfavorable inference" is warranted "when the circumstances indicate" that the failure to turn over the relevant evidence is "otherwise properly accounted for," *Brewer*, 72 F.3d at 334, and Biro "accounted for" his failure to manually record the events, testifying that he "wasn't thinking" about "go[ing] back to [his] car to hit a button" and that he was not required to do so because he initially considered the incident only as a motor vehicle accident. App. 396.

[12] The third State Trooper in the immediate vicinity when Jutrowski was being arrested was not named as a defendant.

21

used excessive force. Jutrowski does not contend that all them kicked him, only that one did; he does not purport to raise a dispute about the extent of each officer's participation, but rather the possibility of it; and what he tenders to fill the evidentiary gap—an adverse inference to be drawn from the absence of a dashcam video—itself lacks support in the record. Laid bare, Jutrowski's argument is that "an issue of material fact as to the identity of the Appellee that kicked," Appellant's Br. 13, is sufficient to reach a jury, and even if it is not under *Howell*, *Sharrar,* and *Smith,* it should be. But in view of those cases, the District Court correctly concluded that all Defendants were entitled to summary judgment on Count I of the complaint. And, though we share the concern expressed by the Seventh Circuit in *Colbert* that our holding could "effectively immunize" perpetrators of constitutional violations who successfully "prevent[] a plaintiff from observing the person responsible for" the harm, 851 F.3d at 657–78, ours is not to break from controlling Circuit precedent.[13]

As the *Colbert* court also observed, however, there may be other "avenue[s] for relief," like a conspiracy claim, that "sufficiently construct[] the necessary causal connection between the official and some wrongdoing, regardless of

---

[13] "[I]t is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels," *Joyce v. Maersk Line Ltd*, 876 F.3d 502, 508 (2017) (en banc), and we are not free to overrule a prior precedential opinion absent *en banc* hearing, *see Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017); 3d Cir. I.O.P. 9.1.

whether the plaintiff was able to observe" the constitutional violation. *See Colbert*, 851 F.3d at 658. It is to such a claim that we now turn.

## B. The Conspiracy Claims Against the Individual Defendants

In his complaint, Jutrowski alleges both a conspiracy to violate his federal civil rights, in violation of § 1983 (Count V), and a conspiracy to violate his state civil rights, in violation of New Jersey law (Count VI). Tracking each other nearly verbatim, each of those Counts pleads two distinct conspiracies among the Individual Defendants: one before he was kicked, to arrest him using excessive force, and another after the fact, to cover up the use of that force.[14] We agree with the District Court that Jutrowski did not proffer sufficient evidence to create a triable issue of fact as to whether the officers "reached

---

[14] Unlike in a criminal indictment, where charging multiple conspiracies in the same count is forbidden by the doctrine of duplicity, *U.S. v. Morrow*, 717 F.3d 800, 804 (3d Cir. 1983), multiple conspiracies may be charged in a single count of a civil complaint. *See, e.g.*, *Hampton v. Hanrahan*, 600 F.2d 600, 621, 627 n.27 (7th Cir. 1979), *rev'd in part on other grounds by Hanrahan v. Hampton*, 466 U.S. 754 (1980). That is because, in the civil context, "[f]ederal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. Rule Civ. Proc. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014). Jutrowski's conspiracy claims meet this standard.

an[y] illicit agreement prior to the alleged kick." *Jutrowski*, 2017 WL 1395474, at \*8. For the reasons explained below, however, we cannot agree that he failed to raise a fact issue concerning "a conspiracy . . . to violate [his] constitutional rights through after-the-fact evidence." *Id.*

### i.    Requirements to Establish a § 1983 Conspiracy

To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law "reached an understanding" to deprive him of his constitutional rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970).[15] Such rights include, of course, those protected by the

---

[15] The elements of a claim of conspiracy to violate federal civil rights are that "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States," with the added gloss under § 1983 that "the conspirators act 'under the color of state law.'" *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (quoting 42 U.S.C. § 1983). Under New Jersey law, the elements of a claim of conspiracy to violate civil rights are essentially the same. *See Banco Popular N.A. v. Gandi* 184 N.J. 161, 177-78 (2005) ("In New Jersey . . . the principal element of [civil conspiracy] is agreement between parties to inflict wrong against or injury upon another, and an overt act that results in damage.") (citations omitted). Thus, although we focus our discussion below on Jutrowski's § 1983 conspiracy claims, their

24

Due Process Clause of the Fourteenth Amendment, such as the "right to be heard in an impartial forum," *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 161 (3d Cir. 2010), and the "right of access to the courts," *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).[16] Those rights "assure[] that no person will be denied the opportunity to present to the judiciary allegations concerning violations of . . . constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).

Although deprivations of the right of access to the courts arise most often in the prison context,[17] *see, e.g.*, *Peterkin v. Jeffes*, 855 F.2d 1021, 1036 (3d Cir. 1988), this right is also denied when law enforcement officers conspire to

resolution also dictates our disposition of his state conspiracy claims.

[16] *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (observing that "[t]he Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases"); *Bounds v. Smith*, 430 U.S. 817, 828 (1977) (describing access to the courts as a "fundamental constitutional right").

[17] The right of access to the courts is sourced from both "the First and Fourteenth Amendments," *Monroe*, 536 F.3d at 205, and is typically framed as a due process right in the inmate context, *see id.* at 209, but in other contexts as "an aspect of the First Amendment right to petition the Government for redress of grievances," *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *but see Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) (describing the right to "meaningful access" to the courts as an "equal protection guarantee").

cover up constitutional violations, *see, e.g.*, *Colbert*, 851 F.3d at 657–58 (holding that the plaintiff could allege under § 1983 that "the named officers participated in something akin to a 'conspiracy of silence among the officers' in which defendants refuse to disclose which of their number has injured the plaintiff"). A "conspiracy of silence" among officers is actionable as a § 1983 conspiracy because the coordinated officer conduct "impede[s] an individual's access to courts " and renders "hollow" a victim's right to redress in a court of law. *Vasquez v. Hernandez*, 60 F.3d 325, 328–29 (7th Cir. 1995) ("[W]hen police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged."); *see also Swiggett v. Upper Merion Twp*., No. 08-2604, 2008 WL 4916039, at *4 (E.D. Pa. Nov. 17, 2008) ("[C]ourts have found that concealing a constitutional violation, including use of excessive force, does not amount to a separate constitutional violation unless the victim of the concealment was deprived of his right of access to the courts.").

After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, "the rule is clear that" the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009) (citing *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)). To show agreement, he must demonstrate that "the state actors named as defendants in the[] complaint somehow reached an understanding to deny [the plaintiff] his rights," *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993), and in the absence of direct proof, that "meeting of the minds" or "understanding

or agreement to conspire" can be "infer[red]" from circumstantial evidence, *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008). Such circumstantial evidence may include that the alleged conspirators "did or said something . . . to create an understanding," "the approximate time when the agreement was made, the specific parties to the agreement[,] the period of the conspiracy, or the object of the conspiracy." *Great W. Mining*, 615 F.3d at 178–79 (citations omitted). And in the context of an alleged conspiracy among police officers, it may manifest as "conversations" between officers about the incident, "allegedly distorted" stories that "emerged," an "awareness of conflicting stories" and "irregularities in the series of official investigations" into the incident. *Hampton v. Hanrahan*, 600 F.2d 600, 627–28 (7th Cir. 1979), *rev'd in part on other grounds by Hanrahan v. Hampton*, 466 U.S. 754 (1980).

Because "inferring mental state from circumstantial evidence is among the chief tasks of factfinders," *Kedra v. Schroeter*, 876 F.3d 424, 444 (3d Cir. 2017) (citing *United States v. Wright*, 665 F.3d 560, 569 (3d. Cir. 2012)), an allegation of conspiracy can only be overcome at summary judgment when "the moving parties' submissions foreclose[] the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that there had been a meeting of the minds," *Anderson*, 477 U.S. at 249 (citing *Adickes*, 398 U.S. 144).

### ii. The Conspiracy Claims Against the Individual Defendants

We dispense quickly with Jutrowski's argument that he sufficiently established an agreement among the Individual

Defendants, before the fact, to use excessive force. While this claim meets the threshold requirement that the alleged conspiracy had the goal of violating a constitutional right, Jutrowski's assertion of a "common plan" among the officers, based on (1) an alleged "reloc[ation] [of] the ambulances so that EMT personnel would not be able to witness the[] attack," and (2) the officers "simultaneously grabbing" him to take him down, is not supported by any specific facts in the record. App. 276.[18] To survive summary judgment, however, "specific facts showing that there is a genuine issue for trial" are precisely what a plaintiff must show, and "[b]are assertions, conclusory allegations, or suspicions" will not suffice. *D.E.,* 765 F.3d at 268–69 (citations omitted). The District Court therefore did not

---

[18] With respect to the moving of the ambulances, the record is devoid of discovery from EMT personnel, and neither Jutrowski's summary judgment opposition below nor his brief on appeal provide any record support for his allegations. Nor does the record support that the officers "simultaneously grabb[ed]" him to take him down. App. 276. Franchino, the officer who effectuated the take-down, testified that he was the "only . . . [one who] took [Jutrowski] to the ground," App. 437, and that not all of the officer-defendants were even near Jutrowski when he executed the "front leg sweep" maneuver, App. 424. The testimony of other officers was consistent with that account. *See, e.g.*, App. 396–97 (Roemmele testifying that he "was walking back" to his vehicle when Jutrowski was initially apprehended). Further, the deposition testimony shows that the takedown "happened instantly," App. 335, after Jutrowski flailed his arm, making it implausible that there was time for a proverbial "meeting of the minds" before he was kicked moments later.

28

err in granting summary judgment on Counts V and VI to the extent they allege before-the-fact conspiracies.

The record paints a different picture, however, for Jutrowski's claims of a conspiracy after the fact. As a threshold matter, we reject Defendants' argument that Jutrowski failed to assert a cognizable conspiratorial objective because "[t]he only injur[y] [he] alleges is . . . to his eye" so that post-injury "actions with regard to [the officers'] paperwork and grand jury testimony cannot possibly form the basis of a conspiracy that led to [his] injuries." State Troopers' Br. 25. The "injury" Jutrowski asserts with respect to this conspiracy is not the application of excessive force but the denial of "access to the courts." *Monroe*, 536 F.3d at 205. And drawing all reasonable inferences, as we must, in Jutrowski's favor, we cannot agree with the District Court that there is insufficient evidence of "collu[sion]" among "the officers from Riverdale and the State Police" to deprive him of that access. *Jutrowski*, 2017 WL 1395474, at \*8.

For starters, material omissions in contemporaneous police reports can reasonably be seen by a jury as evidence that the officers "agreed to abide by [a] claim" about what happened and "agreed to represent [it] falsely," *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984), *rev'd on other grounds by Russ v. Watts*, 413 F.3d 783 (7th Cir. 2005), and omissions specifically as to the infliction of an injury or "reference to the use of force" that indisputably occurred during an arrest "can be as dishonest as an outright lie," *United States v. Seymour*, 472 F.3d 969, 970 (7th Cir. 2007) (finding the omission, in an arrest report, regarding the use of force against a jaywalker to be material because "[t]he test is whether what is omitted is something the intended reader would have

29

expected to see included if it had occurred . . .").  Here, none of the reports by Heimbach, Franchino or Roemmele[19] indicated that Jutrowski suffered significant injuries during the course of his arrest, yet several of the officers admitted in their depositions that Jutrowski's injuries noticeably worsened during his apprehension.[20]  Moreover, notwithstanding the District Court's reasonable rejection of an adverse spoliation inference on the summary judgment record, a reasonable jury considering the inconsistent accounts of the vantage point from Biro's vehicle[21] and the absence of Biro's dashcam footage

---

[19] It appears that Biro did not prepare a separate report, as the one report produced by the Riverdale Police Department was prepared by Roemmele. The State Troopers produced three reports: a Supplemental Investigation Report and Reportable Use of Force report, both prepared by Franchino; and a Drinking Driving Report, prepared by Heimbach,

[20] *See* App. 338 (Heimbach testifying that after his arrest, Jutrowski's "eye was a lot worse than the initial laceration"); App. 368, 380 (Roemmele testifying that before arrest, Jutrowski's injury was a "[s]mall laceration; nothing major" but that afterwards his face looked "different" and it was "[s]wollen [with] more abrasions"); App. 402 (Biro testifying that after being taken to the ground, "there was blood on [Jutrowski's] face, more than what he had"); App. 429 (Franchino testifying that he does not "recall looking at [Jutrowski's] face" but that he "would hope [to] notice[]" if the injuries had worsened).

[21] Biro testified in his deposition that he "kn[e]w [he] was either one or two cars behind" Jutrowski's disabled SUV. App. 394. However, testimony from Heimbach, who arrived

when "all of the [other] automobiles on scene recorded the encounter and all recording[s] but Biro's were produced," Appellant's Br. 23, might infer evidence of a cover-up.[22]

Jutrowski's after-the-fact conspiracy allegations also find support in the time that was available to reach an agreement, *see Great W. Mining*, 615 F.3d at 178, and evidence of "conversations" between officers before the filing of reports, *Hampton*, 600 F.2d at 627. That is, there was undoubtedly time in the unhurried period after the incident and before the finalization of reports and deposition appearances for a "meeting of the minds," *Startzell,* 533 F.3d at 205, and Heimbach acknowledged at his deposition that he "discussed" Jutrowski's case with Franchino and the third trooper involved in the arrest "while . . . going over the reports," and that "prior to writing the narrative report," he "discussed [with them] everything that happened" concerning "the scene and the arrest and subduing of Mr. Jutrowski" in order to straighten out the "sequence of events," App. 341. Franchino also testified that he "remember[ed] speaking about" Jutrowski's injuries with Heimbach within a few weeks of the incident, App. 429, and

---

on the scene after Biro, as well as dashcam footage from Heimbach's vehicle indicates that Biro was parked behind Jutrowski upon arrival.

[22] Decisions regarding the admissibility and admission of such evidence rest in the sound discretion of the District Court. *See U.S. v. Finley*, 726 F.3d 483, 491 (3d Cir. 2013) (noting that "[a] district court is generally afforded broad discretion on evidentiary rulings").

that before submitting his report, it was "possible" that he discussed the "facts of the case" with Heimbach, App. 431.

Moreover, what emerged from these conversations might well be viewed by a reasonable jury as "irregularities" and "distorted" or "conflicting" accounts that suggest "a concerted effort to suppress facts." *Hampton*, 600 F.2d at 628. For example, Roemmele's report, the lone Riverdale Police report as none was produced by Biro, makes reference to the presence of State Troopers, but it does not mention the presence of Biro, who not only participated in the arrest but was also Roemmele's supervisor. Heimbach's report omits any reference to the use of excessive force, although he does not dispute that someone kicked Jutrowski and that his "sole focus" for "the entire time" was on Jutrowski's head, so that "if any[one] . . . struck [Jutrowski] in the face, [he] would [have] know[n]." App. 344. For his part, Trooper Franchino testified that he was the officer "closest to [Jutrowski's] head," and was "less than three feet" away when Jutrowski was taken to the ground, App. 438, but professed that he did not ever "look[] at [Jutrowski's] face," App. 432, and that he checked the box for "moderate injury" on his use of force report only because "possib[ly] someone told" him to do it, App. 434. The Riverdale officers, who were also in Jutrowski's immediate vicinity, likewise do not contest that a kick occurred, but Roemmele made no reference to it in the one report produced by the Riverdale Police Department, and both officers contend that they did not see it. Furthermore, all of this may be considered against the backdrop of the other evidence in the record on summary judgment, including the report of a medical expert, who averred that Jutrowski's injury most likely resulted from "either a kick or punch of significant force." App. 263.

In short, what Jutrowski put forward concerning alleged federal and state conspiracies to deprive him of access to the courts was sufficient to create a genuine issue of material fact. And he did so, consistent with *Smith*, for each of the Individual Defendants. That is, Jutrowski alleged that "all" of "Defendant officers . . . did act together and in concert" to conspire to violate his civil rights, App. 269, that all "[t]he police officers" are implicated in a cover-up, App. 493, and that each of them "perjured themselves," App. 492, in "covering up" the use of excessive force and "protecting each other," App. 495. Because he adduced evidence to support those allegations "such that a reasonable jury could return a verdict" in his favor, *Anderson*, 477 U.S. at 248, we will reverse District Court's entry of summary judgment on Counts V and VI to the extent they allege after-the-fact conspiracies, and we will remand for further proceedings on those claims against the Individual Defendants.

## IV. Conclusion

For the foregoing reasons, we will affirm in part and reverse in part and will remand for proceedings consistent with this opinion.